FICOR, INC., a corporation of the District of Columbia; John F. Forstmann; Vankirk E. Fehr; Bruce B. Brundage; Fourven Limited Partnership, a Colorado limited partnership; The Recreational Environmental Development Corporation; and Geoffrey W. Robertson, Petitioners,

v.

Jerome P. McHUGH; Jerome P. McHugh, as Trustee; Recreation Land Company; Dwight L. Johnson; and Denver Internal Medicine Associates, a professional company profit sharing trust; Herbert J. Rothenberg; H. Blair Carlson; Barry W. Frank; William E. Mann; Donald L. Patton; and all other trustees and beneficiaries of the Denver Internal Medicine Associates Profit Sharing Trust, Respondents.

No. 80SC54.

Supreme Court of Colorado,
En Banc.

Jan. 4, 1982.

Davis, Graham & Stubbs, Thomas S. Nichols, Denver, for petitioners.

Roath & Brega, Roger P. Thomasch, Denver, for respondents.

LOHR, Justice.

We granted certiorari to review the decision of the Colorado Court of Appeals in *McHugh v. Ficor, Inc.*, 43 Colo.App. 409, 611 P.2d 578 (1979), which upheld the judgment of the Denver District Court imposing joint and several liability upon the petitioners, who are the directors, officers, shareholders, and transferees of Ficor, Inc. (Ficor), because provisions were not made to protect the creditors of that corporation when it was dissolved. Also in dispute is the propriety of the trial court's ruling, upheld by the court of appeals, dismissing the petitioners' counterclaim for damages based on alleged fraud in the inducement of a contract by which Ficor agreed to purchase certain undeveloped mountain land. We affirm the decision of the court of appeals, with certain modifications which will be described.

This litigation arose out of events surrounding the financial failure of a land development project on 14.577 acres in Summit County, Colorado, near the town of Breckenridge. At the beginning of 1971 the respondents (McHugh group) were the owners of the undeveloped 14.577 acre parcel, which they had acquired in 1970 from Berry and Stark. The land was subject to the lien of a deed of trust securing the McHugh group's purchase money promissory note to Berry and Stark in the principal amount of $749,103.92.

The individual petitioners began negotiating with the McHugh group early in 1971 to purchase the land for the development of a lodge and a residential condominium ownership project. In July 1971 the individual petitioners formed Ficor, a District of Columbia corporation, to be used as a vehicle for acquiring the land. Ficor was to be a shell corporation without assets.[1] The negotiations resulted in a written sales agreement dated October 2, 1971, between the McHugh group[2] and Ficor, and on November 18, 1971, the transaction was closed. The purchase price was $825,466.36. Ficor assumed the obligations under the Berry and Stark note pursuant to its terms, which required nine annual installments in varying amounts, beginning November 25, 1971. The balance of the purchase price, in the approximate amount of $75,000, was paid in

---

1. The minutes of the first meeting of the board of directors of Ficor recite in part:

   The Chairman indicated to the meeting that the only purpose of the Corporation was to acquire legal title to a parcel of land located in Colorado as a straw party or nominee for and on behalf of its principals, Bruce B. Brundage, VanKirk E. Fehr, John F. Forstmann, and Geoffrey W. Robertson, in order to protect the principals from personal liability on the acquisition. Immediately after the acquisition the Corporation, pursuant to instructions from its principals, would execute certain promissory notes, deeds of trust and other instruments involving the acquisition and would subsequently convey such land, as then encumbered, to its principals. The Chairman stated further that the Corporation, which is a straw party and nominee, would engage in no trade or business activities whatsoever and would have no receipts and disbursements and no income or expenses.

2. The composition of the McHugh group was somewhat different at the time of execution of the contract than at the time this suit was instituted. The changes are of no importance to the issues before us.

cash obtained from a loan made to Ficor by Security National Bank. The written assumption agreement reflecting Ficor's undertaking to pay the Berry and Stark note was secured by a deed of trust, junior to the Berry and Stark deed of trust, on the 14.577 acres. The McHugh group remained obligated on the Berry and Stark note.

The Berry and Stark deed of trust provided for partial release of one square foot of land for each $0.75 in principal payment. The same payments would earn a partial release of the identical parcel from the assumption agreement deed of trust. Thus, the release of the entire 14.577 acres could be obtained upon payment of only $476,-230.59 [3] toward the $749,103.92 principal obligation on the Berry and Stark note.

The individual petitioners held the following ownership interests and offices in Ficor:

| Name | Number of Shares | Office |
|---|---|---|
| John F. Forstmann | 36 shares | President and Director |
| VanKirk E. Fehr | 27 shares | Vice President, Secretary, and Director |
| Bruce B. Brundage | 32 shares | Treasurer and Director |
| Geoffrey W. Robertson | 5 shares | None |
| Total: | 100 shares (total issued) | |

The individuals paid nothing for their stock.

After the closing, Ficor and the individual petitioners sought legal advice on how to structure the development of the project to obtain the most advantageous income tax treatment. Based on the advice obtained, they decided to form a new corporation, Recreational Environmental Development Corporation (Redco), and a new limited partnership, Fourven, to take ownership of the property and develop it.

Redco was formed in January 1972. The stock ownership in Redco was identical to that in Ficor. Forstmann, Fehr, Brundage, and Robertson were officers and directors of Redco. Fourven was formed on March 1, 1972, with Forstmann, Fehr, Brundage, and Robertson as general partners. The record does not reflect whether there were any limited partners.

To accomplish the ownership change, Ficor was dissolved on March 1, 1972, and all its assets were distributed to its shareholders in proportion to their stock ownership. These assets consisted of $38,728 in cash and the 14.577 acres of land. The individuals then contributed the assets to Redco and Fourven in return for their respective interests in those new entities. Redco received the 3.545 acre parcel upon which the initial construction was planned and all but $2,000 of the cash.[4] Fourven received the 11.032 acres not planned for immediate development. The corporate existence of Ficor was then terminated.[5]

3. (14.577 acres) (43,560 square feet/acre) ($0.75/square foot) = $476,230.59. This disproportion between the percentage of principal paid and the percentage of security lost by partial release earned by such payment was exacerbated by a provision in the assumption agreement deed of trust permitting Ficor to select the parcels to be released, thus permitting the more valuable parcels to be released first.

4. The remaining $2,000 was retained by the individuals in a bank account for payment of expenses of Redco and Fourven.

5. The effect of a corporate dissolution is similar under Colorado and District of Columbia law. Upon the issuance of a certificate of dissolution following the winding up of corporate affairs, the Colorado Corporation Code provides that "the existence of the corporation shall cease, except for the purpose of suits, other proceedings, and appropriate corporate action by

At the time of its dissolution, Ficor had made one payment on the Berry and Stark note, in the amount of $118,189.78. Based on that payment, the 3.545 acre parcel had been released from the liens securing the Berry and Stark note and the assumption agreement. The 3.545 acre parcel was then subjected to a deed of trust for the benefit of Security National Bank to secure a $250,000 loan from that bank to Ficor. Consequently, as of March 1, 1972, Ficor was obligated for the principal and outstanding interest of the Berry and Stark note and the $250,000 principal plus accrued interest of the Security National Bank loan. Ficor's obligation on the Berry and Stark note was secured by the assumption agreement deed of trust on the 11.032 acres ultimately transferred to Fourven. Ficor's obligation to Security National Bank was secured by a lien on the 3.545 acre parcel. When Ficor was dissolved no provision was made for the payment of its obligations on the Berry and Stark promissory note. Ficor did not advise the McHugh group of the dissolution.

All the money for the purchase and development of the land was obtained by borrowing. It is not necessary to describe the loans in detail. It suffices to say that following the original loan of $250,000 and the dissolution of Ficor, successive loans of $2,500,000,[6] $240,000, and $150,000 were made to Ficor's successors in ownership by Security National Bank for land payments and construction financing. The individual petitioners became personally liable for each loan.

In August and November of 1972, following the dissolution of Ficor, additional payments of principal and interest totalling $149,934 were made by the petitioners in satisfaction of the November 1972 installment on the Berry and Stark note. Based on these payments, parcels of 2.951 acres and 0.442 acres were released from the liens of the Berry and Stark deed of trust and the assumption agreement deed of trust. Each of the released parcels ultimately was subjected to a deed of trust for the benefit of Security National Bank to secure the outstanding bank loans.

A general contractor was engaged to build the planned improvements on the 3.545 acre parcel. The construction work fell behind schedule, and disputes about the contractor's performance arose. As one result, the Ficor group[7] was unable to make required payments on the bank loans and did not make the November 1973 payment on the Berry and Stark note. The members of the Ficor group settled their resulting disputes with Security National Bank and the contractor and, as part of that settlement, the bank accepted from Redco and Fourven deeds in lieu of foreclosure to the 3.545 acres, the 2.951 acres, and the 0.442 acres, all of which had been previously released from the liens of the Berry and Stark deed of trust and the assumption agreement deed of trust. In return, the bank loans, upon which the individual petitioners were personally liable, were satisfied.

The McHugh group foreclosed the assumption agreement deed of trust and, by bidding $413,000 at the foreclosure sale, acquired the entire 7.639 acres still subject to that lien and to the lien of the Berry and Stark deed of trust. The McHugh group then brought this action in Denver District Court, seeking recovery against Ficor, Fourven, Redco, and the individual petitioners for the amount remaining unpaid on the Berry and Stark note. The claim against Ficor was predicated on the assumption agreement. The claims against the individuals were based upon the alleged impropriety of the distribution of Ficor's assets to the individual shareholders on liquidation of Fi-

shareholders, directors, and officers as provided in this code." Section 7–8–108(2), C.R.S. 1973. The corresponding District of Columbia statute is identical except that it refers to "chapter" where the Colorado statute refers to "code". D.C.Code § 29–387(b) (1981).

6. This was a construction loan; although the record is not definitive, it appears this loan was only partially disbursed.

7. For convenience, we sometimes refer to Ficor, the individual petitioners, Redco, and Fourven as the Ficor group.

cor, and the action of the individual directors in authorizing that dissolution. Redco and Fourven were alleged to have received Ficor's assets with knowledge of the assertedly improper distributions.[8] The petitioners counterclaimed, averring that they had been induced to execute the contract for purchase of the 14.577 acre parcel by fraudulent representations made by the McHugh group.

After a trial to the court, judgment was entered against all the petitioners except Ficor, jointly and severally, in the amount of $267,533 plus interest and costs. The trial court dismissed the counterclaim. The petitioners appealed from the judgment. The court of appeals affirmed, except for the computation of damages, and remanded the matter for additional findings relating to the amount of those damages. We then granted certiorari.

The court of appeals placed reliance on the Colorado Corporation Code, *see* section 7–1–101 et seq., C.R.S. 1973 and concluded that the individual petitioners' liability had its source in the failure of Ficor to make adequate provision for payment of its creditors upon dissolution. *See* section 7–8–105(2), C.R.S. 1973. It also concluded that Redco and Fourven were liable because they accepted Ficor's assets with knowledge of the improper distribution. The Ficor group contends that this theory of liability should not have been considered, as it was not pleaded, and that even if the Colorado Corporation Code is applicable the court of appeals has misapplied it here. The Ficor group also claims that no liability should be imposed because the dissolution of Ficor was not the proximate cause of the respondents' loss. In addition, the Ficor group contests the manner of computing damages. Robertson, the 5% shareholder in Ficor, challenges the imposition of liability upon him for the entire amount of the respondents' judgment. Finally, the Ficor group urges that its counterclaim was improperly dismissed.

We consider all these questions in the course of our discussion of the issues, although we address them in a different order. We first dispose of two preliminary matters raised by the petitioners.

## I.

■ The trial court adopted without change the proposed findings of fact and conclusions of law submitted by the McHugh group at the court's request. The petitioners assert that this permits us to examine the record "essentially on a *de novo* basis" and to arrive at our own factual conclusions. This is not the case. Although we will scrutinize a trial court's findings critically under these circumstances, *Uptime Corp. v. Colorado Research Corp.*, 161 Colo. 87, 420 P.2d 232 (1966), we will sustain those findings if they are supported by the evidence, *id.* As we stated in *Uptime*, "On appeal, the court will assume that the trial judge examined the proposed findings and agreed that they correctly stated the facts as he himself found them to be; otherwise, he would not have adopted them as his own." *Id.*, 161 Colo. at 93, 420 P.2d at 235.

## II.

■ We also find no merit in the petitioners' contention that the Colorado Corporation Code should not be applied because it was not pleaded by the parties or relied upon by the trial court. Prior to trial the parties submitted a document entitled "Joint Trial Data Certificate," which reviewed the pleadings to that point, summarized the undisputed facts and disputed issues, and presented the petitioners' and respondents' points of law. The McHugh group's statement of legal arguments expressly notified the petitioners and the court of the McHugh group's intent to rely on the directors' liability statutes of the District of Columbia. While we conclude that Colorado rather than District of Columbia law is controlling, the relevant statutes in these two jurisdictions are substan-

---

**8.** A common-law fraud claim was also asserted against all the petitioners. It was dismissed at the conclusion of the McHugh group's case. The dismissal was not challenged on appeal.

tially identical.[9] Thus, the petitioners have been aware of their potential statutory liability at least since the pre-trial execution of the Joint Trial Data Certificate; that basis of liability was properly before the trial court; and the petitioners can claim no unfair surprise from the court of appeals' reliance on the Colorado Corporation Code. Further, the petitioners have had full opportunity following the court of appeals' decision to brief and argue the statutory issue now before this court. This is not a case where the petitioners have been prejudiced by the failure to raise a statutory claim until appeal, *see Wagner v. Dan Unfug Motors, Inc.*, 35 Colo.App. 102, 529 P.2d 656 (1974), and we perceive no injustice in applying the relevant provisions of the Colorado Corporation Code to resolve the controversy before us.

### III.

Before we can consider the merits of the claims of the Ficor group we must determine the law which is applicable to the relationships among the parties.

■ Ficor was a District of Columbia corporation. Thus, the method of effecting its dissolution is governed by the laws of that district. *See Restatement (Second) of Conflict of Laws* § 299, Comment g. and Illustration (1971). The law governing the relevant rights and obligations between corporate creditors on the one hand, and officers, directors and shareholders of the corporation on the other, is less readily determinable. In *Restatement (Second) of Conflict of Laws* § 309 (1971) it is said:

> The local law of the state of incorporation will be applied to determine the ex-

istence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.[10]

Here, Ficor was incorporated solely for the purpose of acquiring and developing the Summit County project. Except for its incorporation in the District of Columbia and the fact that some of its officers, directors, and shareholders reside in or near the District of Columbia, all of Ficor's activities were conducted in Colorado and all of its assets were located here. Under these circumstances we conclude that the rights and duties between the corporation's directors and shareholders and the corporation's creditors, incident to Ficor's dissolution, should be determined under Colorado law. *See Francis v. United Jersey Bank*, 162 N.J.Super. 355, 392 A.2d 1233 (1978), aff'd. 87 N.J. 15, 432 A.2d 814 (1981); *Restatement (Second) of Conflicts of Laws*, § 309, Comment c. (1971). As we shall note, the law of Colorado is so similar to the law of the District of Columbia on most points involved in this case that application of District of Columbia law would yield the same result which we reach by applying Colorado law.

### IV.

The trial court concluded that the directors of a corporation which is being liquidated are trustees for the creditors of the corporation and are personally liable to those creditors if they take corporate prop-

---

**9.** See footnotes 11, 12, and 13, *infra.*

**10.** *Restatement (Second) of Conflict of Laws* § 6 (1971) states:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
  (a) the needs of the interstate and international systems,
  (b) the relevant policies of the forum,
  (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
  (d) the protection of justified expectations,
  (e) the basic policies underlying the particular field of law,
  (f) certainty, predictability and uniformity of result, and
  (g) ease in the determination and application of the law to be applied.

erty for their own benefit rather than making provision for the payment of creditors. In reaching this conclusion the trial court relied on *Crowley v. Green*, 148 Colo. 142, 365 P.2d 230 (1961), *Rosebud Corp. v. Boggio*, 39 Colo.App. 84, 561 P.2d 367 (1977), and *Epcon Co. v. Bar-B-Que Baron International Inc.*, 32 Colo.App. 393, 512 P.2d 646 (1973). *Accord, Gaskins v. Bonfils*, 79 F.2d 352 (10th Cir. 1935); 19 *C.J.S. Corporations* § 1391. In affirming the judgment, the court of appeals relied instead on sections 7–8–105 and 7–5–114(3), C.R.S. 1973, which define a corporation's duties and directors' obligations incident to corporate dissolution. We conclude that the court of appeals was correct in holding that these statutes control the disposition of this case.

### A.

The relevant statutory scheme established by the Colorado Corporation Code can be briefly outlined. The duties of a corporation with respect to corporate liabilities and obligations outstanding at the time of dissolution are prescribed by section 7–8–105, C.R.S. 1973:

> (1) After the filing by the secretary of state of a statement of intent to dissolve, the corporation shall immediately cause notice thereof to be mailed to each known creditor of the corporation.
>
> (2) The corporation shall proceed to collect its assets, convey and dispose of such of its properties as are not to be distributed in kind to its shareholders, pay, satisfy, and discharge its liabilities and obligations, and do all other acts required to liquidate its business and affairs and, after paying or adequately providing for the payment of all its obligations, distribute the remainder of its assets, either in cash or in kind, among its shareholders according to their respective rights and interests.[11]

This statute requires simply that shareholders not receive corporate assets on dissolution unless and until creditors have been paid or adequate provision for such payment has been made. It expresses the legislative intent that creditors be preferred over shareholders in dividing assets on dissolution.

Failure of the corporate directors to assure compliance with the entity's obligations to provide for payment of creditors upon dissolution gives rise to potential personal liability for those obligations, by reason of section 7–5–114(3), C.R.S. 1973:

> The directors of a corporation who vote for or assent to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all known debts, obligations, and liabilities of the corporation shall be jointly and severally liable to the corporation for the value of such assets which are distributed, to the extent that such debts, obligations, and liabilities of the corporation are not thereafter paid and discharged.[12]

Finally, directors are given a right of contribution against shareholders who receive assets pursuant to an improper distribution, as provided in section 7–5–114(7), C.R.S. 1973:

> Any director against whom a claim is asserted under or pursuant to this section for the payment of a dividend or other distribution of assets of a corporation and who is held liable thereon shall be entitled to contribution from the shareholders who accepted or received any such dividend or assets, knowing the dividend or distribution to have been made in violation of this section, in proportion to the amounts received by them respectively.[13]

---

**11.** D.C.Code § 29–381(1) (1981) is substantially identical to section 7–8–105(2), C.R.S. 1973. The District of Columbia code contains no provision comparable to section 7–8–105(1), C.R.S. 1973, requiring that notice of the intended dissolution be given to the creditors.

**12.** D.C.Code § 29–342(a)(3) (1981) is substantially identical to section 7–5–114(3), C.R.S. 1973 except that the Colorado provision is limited to *known* debts, obligations and liabilities, whereas the District of Columbia provision is not so limited.

**13.** D.C.Code § 29–342(e) (1981) is substantially

### B.

In determining the Ficor group's liability under these statutes, our first inquiry is whether the McHugh group, as unpaid creditors, can claim under section 7–5–114(3). That statute specifies that the directors' liability is to the *corporation* and makes no mention of relief for the unpaid *creditors.*

■ We first note that the purpose behind section 7–5–114(3) is the protection of creditors. *See generally,* Cary, *Corporations, Cases and Materials,* 865–67 (4th Ed. 1969). Indeed, since the corporate existence is terminated, *see* n. 5, *supra,* the only reason to permit recovery by the corporation is so that it may utilize the monies to satisfy the unpaid creditors. This point is made explicit by a frequently-encountered variation in the substantially similar directors' liability statutes of other jurisdictions, which provide that liability is to the "corporation for the benefit of its creditors." *See e.g.,* Cal.Corp.Code Ann. § 316(a) (West 1977); M.C.L.A. § 450.1551(1) Mich.Stat. Ann. § 21.200(551)(1) (1974); N.J.Stat.Ann. § 14A:6–12(1) (1981–82 Supp.); N.Y.Bus. Corp.Law § 719(a) (McKinney 1963).[14]

However, it does not necessarily follow that creditors can individually recover· *on their own behalf* under this statute, and the purpose of nominally placing the remedy in the corporation rather than the creditors is to avoid that result. *See Rosebud Corp. v. Boggio, supra; Wakeman v. Paulson,* 264

Or. 524, 506 P.2d 683 (1973); Cary, *Corporations, Cases and Materials, supra* at 865–67; *see generally, Davis v. Ben O'Callaghan Co.,* 238 Ga. 218, 232 S.E.2d 53 (1977). The rationale for placing the remedy in the corporation rather than the creditors is made clear by the comments accompanying adoption of similar director liability statutes in other states. New York is illustrative:

> The remedy for the enforcement of directors' liability is given exclusively to the corporation... This provision is intended to eliminate the possibility, currently recognized in some cases, of an action by a single creditor or shareholder to recover a fund that rightfully belongs to all creditors or shareholders similarly situated. N.Y.Bus.Corp.Law § 719, comment (McKinney 1963).[15]

■ The remaining question is whether all creditors of a corporation, as a group, may assert this remedy on behalf of the corporation for their own benefit. Since the statute is for the purpose of protecting creditors, and limitation of the remedy to the corporation is only to ensure that all creditors are treated equally, we conclude that such an action can be brought. *See J. H. Hincke Printing Co. v. Bailey,* 83 Colo. 242, 263 P. 719 (1928); *Wakeman v. Paulson, supra,*[16] *see generally* 3A *Fletcher, Cyclopedia of Corporations,* §§ 1183, 1185

---

identical to section 7–5–114(7), C.R.S. 1973.

**14.** The directors' liability statutes in most jurisdictions are substantially similar. The source of that similarity is the Model Business Corporation Act, which includes a section entitled "Liability of Directors in Certain Cases." *See* Model Bus.Corp.Act Ann.2d § 48 (1971); Model Bus.Corp.Act Ann. § 43 (1960). This section of the act has served as the inspiration and model for such statutes throughout the country.

**15.** *See also* Ala.Code § 10–2A–75, comment (1975); Mass.Gen.Laws Ann. ch. 156B, § 61, comment (1970); *McGivern v. Amasa Lumber Co.,* 77 Wis.2d 241, 252 N.W.2d 371 n. 11 (1977); *Cf. Super Valu Stores, Inc. v. First National Bank,* 463 F.Supp. 1183 (M.D.Ga. 1979); *Speer v. Dighton Grain, Inc.,* 229 Kan. 272, 624 P.2d 952 (1981); *Sutton v. Reagan & Gee,* 405 S.W.2d 828 (Tex.Civ.App.1966);

(these cases hold that common law actions against directors for breach of a fiduciary duty owed to a corporation must be asserted by the corporation or on the corporation's behalf and cannot be asserted by a creditor on his own behalf).

**16.** *Wakeman* held only that the creditors could not assert the director liability statute on their own behalf. It assumed that in a proper proceeding the liability of the directors to the corporation could be enforced for the benefit of the creditors. We similarly read *Rosebud Corp. v. Boggio,* 39 Colo.App. 84, 561 P.2d 367 (1977) as limited to the question of whether creditors can assert section 7–5–114(3), C.R.S. 1973 on their own behalf. Moreover, since that case did not involve a liquidation, an independent ground justified resolution of that controversy under the common law.

(1975). The alternative of denying creditors this right would substantially undercut the efficacy of this statute; the corporate existence has been terminated and former directors, officers, or shareholders could be expected to have little interest in instituting such an action. In the instant case, all the former directors, officers, and shareholders are included among the persons against whom recovery is sought.

The McHugh group brought this action on their own behalf rather than in the name of the corporation, in apparent violation of the procedural requirements of section 7–5–114(3). However, the record indicates that the McHugh group is the only unpaid creditor of Ficor.[17] As discussed above, the only purpose of placing the remedy in the corporation rather than its creditors is to assure that one creditor does not benefit at the expense of others similarly situated. Since that evil will not arise under the facts of this case and since the precise issue presented here is a question of first impression, we conclude that the McHugh group should be allowed to assert this claim on its own behalf. To deny relief under the present facts because of this procedural defect would frustrate the underlying policy of protecting creditors without advancing the policy of assuring that similarly situated creditors are treated equally.

### C.

Turning to the merits of the McHugh group's claim, there can be little doubt that Ficor breached its statutory obligation to make adequate provision for payment of future installments on the Berry and Stark note. Ficor distributed the 14.577 acres to its shareholders without requiring that the shareholders or their transferees, Redco and Fourven, assume that purchase money obligation. Although in fact the 1972 payment was made to Berry and Stark after Ficor had been dissolved, no legally enforceable obligation was created upon the individual petitioners, Redco, or Fourven to make such payments. Indeed, in testimony at trial,

the petitioner Forstmann specifically took the position that no such liability exists.

The Ficor group nevertheless contends that the McHugh group's misfortune is the result of the bargain which it made. The argument proceeds as follows: The McHugh group contractually limited its security to the 14.577 acres; the fact that the McHugh group's security diminished disproportionately as payments were made on the Berry and Stark note, see n. 3, supra, was simply the result of the unfavorable partial release provisions negotiated by the McHugh group; therefore, personal liability cannot now be imposed in the face of these contractual limitations on the McHugh group's recourse. However, this line of argument neglects the fact that the McHugh group also could legitimately assume that the business of Ficor would be conducted in accordance with established principles of corporate law. While unsecured creditors necessarily take the risk that a business may fail because of adverse economic conditions or unwise business decisions, they do not accept as a risk without remedy the possibility that a corporation will transfer the assets of its business to its shareholders without consideration. Yet this is precisely what occurred here. Liability is imposed under these facts for a breach of the individual petitioners' statutory obligations, not on the basis of the contract they entered.

The Ficor group also urges that even if the dissolution and liquidation were accomplished in violation of the requirement to make adequate provision for payment of corporate obligations, the McHugh group was not damaged thereby. The reasoning is that nothing was done by Redco, Fourven, or the individual petitioners which could not have been done by Ficor fully consistent with the rights of the McHugh group. Thus, the argument continues, the project failure resulted from economic conditions, business decisions and difficulties with a general contractor which could have occurred in like manner and with like conse-

---

17. Counsel for the McHugh group represented in closing argument in the trial court that the

McHugh group was the only unpaid creditor. Nothing to the contrary appears in the record.

quences had Ficor continued the business. This may be. However, the liability of the directors who voted for the distribution is not limited to those portions of the debts, obligations, and liabilities which are not paid as a causal effect of the dissolution. To the contrary, the plain language of section 7–5–114(3), C.R.S. 1973 extends their liability to debts that go unpaid for any reason.[18] We conclude, therefore, that Forstmann, Fehr, and Brundage, the three directors who approved the distribution, are jointly and severally liable to the McHugh group.

## V.

■ We do not agree, however, that joint and several liability for the entire amount of damages was properly imposed on Robertson. That liability was premised upon the court of appeals' conclusion that Robertson was a prime mover in Ficor's wrongful dissolution and that he shared equal responsibility and blame with the directors. Our review of the record persuades us that the court of appeals erred in its characterization of Robertson's role. Robertson was not an officer or director of Ficor. He became vice president and a director of Redco upon its formation and was a general partner in Fourven. The only other action by Robertson upon which the court of appeals' conclusion could be based is his recommendation of the law firm from which the Ficor group obtained tax advice, including the advice which resulted in the decision to dissolve Ficor. We do not consider these activities sufficient in themselves to justify the court of appeals' determination, and there is nothing else in the record to indicate that Robertson assumed a leading role at any other stage of the corporate dissolution. Under these facts, it was inappropriate to extend to Robertson the full measure of liability statutorily imposed upon Ficor's directors.

Nevertheless, Robertson did acquire corporate property with knowledge that the distribution was being made in the absence of provisions for payment of the Berry and Stark note. Equity will not allow him to retain the benefit of the property which he received, but it requires no more than that he be jointly and severally liable with the directors for payment of the value of such property. *See* section 7–5–114(7), C.R.S. 1973; *Gaskins v. Bonfils, supra; Epcon Co. v. Bar-B-Que Baron International, Inc., supra; Benoit v. Commissioner of Internal Revenue*, 238 F.2d 485 (1st Cir. 1956); *Capshaw v. Smith Estates, Inc.*, 69 F.R.D. 598 (D.Del.1976); 16A *Fletcher, Cyclopedia of Corporations*, § 8161 (1979).

■ Finally, on liability, we conclude that Fourven and Redco are jointly and severally liable to the extent of the value of the property received by them with knowledge of the improper distribution. *See* 16A *Fletcher, Cyclopedia of Corporations*, § 8161 (1979).

## VI.

■ The court of appeals determined that the trial court erred in several respects in its calculation of damages. We agree. As the court of appeals concluded, the damages prescribed by statute are the lesser of the value of the assets distributed to the shareholders, measured at the time of the distribution, and the amount owed by Ficor on the Berry and Stark note, to the extent that obligation is not thereafter paid or discharged. *See* section 7–5–114(3), C.R.S. 1973. That court also properly held that the value of the assets distributed is their market value less the amount of the liens against them.

The Ficor group contends that, in determining the value of the assets distributed,

---

18. It is instructive to compare the language employed in New York's comparable statutory provision. It limits liability "to the extent of any injury suffered by [the creditors or shareholders], respectively, *as a result of* such action [i.e. violation of the proscription against improper distribution of corporate assets.]." N.Y. Bus.Corp.Law § 61 (McKinney 1963); *see also* N.J.Stat.Ann. § 14A:6–12(1) (1981–82 Supp.). If the Colorado legislature had wished to impose a similar limitation on a director's liability, it was fully capable of doing so. It has, however, adopted a different approach.

the $149,934 paid by it on the Berry and Stark note subsequent to Ficor's dissolution should be deducted. The argument is that the practical effect of this payment was to accomplish a return of $149,934 to the corporation, and that such amount was properly used to pay Ficor's creditor, Berry and Stark. This argument neglects the fact that the payment also increased the value of the assets improperly distributed to Ficor's shareholders by earning the release of 3.393 acres from the liens securing the Berry and Stark note and the assumption agreement. We conclude that it would be inequitable to treat the $149,934 payment as a return of corporate assets improperly distributed unless we were also to take into account the benefit to the Ficor group resulting from the partial release of the wrongfully distributed land. Under these facts the court of appeals correctly decided to select the time of the improper distribution as the time appropriate for valuation of the assets distributed and the amounts of the liens encumbering those assets.

We disagree with the court of appeals' damages formulation in one respect only. To value part of the assets distributed to the shareholders, that court directed the trial court to determine on remand the market value of the 7.619 acre parcel at the time of distribution and to determine its net value and the net value of the 3.393 acre parcel at that time by allocating to and deducting from the market values of such parcels their proportionate shares of the amount then unpaid on the Berry and Stark note. We conclude, however, that the 11.012 acres (7.619 plus 3.393) should be valued as a single parcel and that its net value on dissolution should be arrived at by deducting from its market value the entire amount of principal and accrued interest then unpaid on the Berry and Stark note, which was at that time secured by a lien on the entire 11.012 acres.

In all other respects, we conclude that the court of appeals has prescribed the appropriate formula for computation of damages and has identified the findings which must be made by the trial court on remand to quantify the damages. Whether the trial court relies on evidence in the existing record or allows the presentation of additional evidence to arrive at the required findings should be left to its discretion. It would serve no useful purpose to repeat the court of appeals' discussion of the damage question here.

VII.

The Ficor group contends that the trial court improperly applied the parol evidence rule to dismiss its counterclaim. It asserts that the parol evidence rule does not bar proof of fraud in the inducement of a contract. While we agree that this is so, see, e.g., Bill Dreiling Motor Co. v. Shultz, 168 Colo. 59, 450 P.2d 70 (1969), the trial court's findings and conclusions fully support its order of dismissal of the counterclaim.

The trial court found that the October 2, 1971, purchase and sale agreement set forth all the representations made by the McHugh group to Ficor with respect to the land sale and concluded that the agreement on its face provided that the McHugh group's warranties with respect to these matters would not survive the closing. It further found that this construction of the agreement was consistent with the parties' intent. Moreover, it found that the Ficor group had failed to carry its burden of proving by clear and convincing evidence the misrepresentation, nondisclosure, and fraud necessary to support its counterclaim. See Wiley v. Byrd, 158 Colo. 479, 408 P.2d 72 (1965); Wallick v. Eaton, 110 Colo. 358, 134 P.2d 727 (1943).

The court of appeals reviewed the record and concluded that the trial court's findings were supported by the evidence. Our independent review of the record leads us to the same conclusion. The counterclaim was properly dismissed.

We affirm the court of appeals' decision subject to the modifications discussed herein and return this case to the court of appeals to be remanded to the trial court with directions to make the findings necessary to determine the amounts for which

the petitioners are liable, as more particularly specified in the court of appeals' directions on remand, and to modify the judgment consistent with the views expressed in this opinion.