In re MS55, INC. f/k/a MSHOW.COM,
Inc., Debtor.

Jeffrey L. Hill, Trustee, Plaintiff,

v.

Gibson Dunn & Crutcher,
LLP, Defendant.

Bankruptcy No. 01–20494 ABC.
Adversary No. 04–1650 ABC.

United States Bankruptcy Court,
D. Colorado.

Feb. 28, 2006.

Douglas W. Jessop, Donald D. Allen, Denver, CO, for Debtor.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A. BRUCE CAMPBELL, Bankruptcy Judge.

This matter comes before the Court on the Motion for Summary Judgment ("Motion") filed by Defendant Gibson Dunn & Crutcher, LLP ("GDC").

### I. BACKGROUND AND POSITIONS OF THE PARTIES

#### A. Uncontested Facts

On July 19, 2001, the Debtor, ms44, Inc., f/k/a MSHOW.COM, Inc. ("Mshow" or "Debtor") filed a Chapter 11 petition. Mshow's Chapter 11 case was converted to Chapter 7 on June 20, 2003, and Plaintiff Jeffrey L. Hill was appointed Chapter 7 Trustee ("Plaintiff" or "Trustee"). Plaintiff filed this adversary proceeding against GDC on June 18, 2004. Plaintiff's Amended Complaint, filed June 28, 2004, contains six claims for relief against GDC. They are: 1) breach of fiduciary duty, 2) legal malpractice/negligence, 3) civil conspiracy to commit fraudulent transfers and breach of fiduciary duties, 4) aiding and abetting breach of fiduciary duties, 5) securities fraud under the Colorado Securities Act, and 6) disallowance of GDC's claim for unpaid legal fees.

The Amended Complaint centers on GDC's actions in connection with various financing transactions involving Mshow and certain insiders of Mshow, including Akamai Technologies, Inc. ("Akamai"), Blue Chip Capital Fund III, Ltd. ("Blue Chip"), and Howard Leach or entities under his control ("Leach"). The background facts concerning the financial difficulties of Mshow which began in March, 2000, and the financing transactions at issue in this case, in so far as they are undisputed, are as follows.

Mshow was formed in 1998 by Tom Lopez, Frank Johnson and Robert Ogdon. *Deposition of Robert Ogdon ("Ogdon depo."),* p. 14, l. 7–23, p. 18, l. 9–11. Its primary business related to the development of technology which allowed images over the internet to be coordinated with a voice over the telephone. *Ogdon depo.,* p. 15, l. 23–p. 16, l.14. Mshow's technology was particularly useful for facilitating communications at business meetings. It allowed, for example, a sales presentation to be made simultaneously to a number of persons at locations around the country or around the world. *Ogdon depo.,* p. 19, l. 21–p. 20, l. 8; p. 27, l. 11–16; p. 28, l. 13–21.

Mshow was dealt a severe blow by the downturn in the dot-com industry which occurred in March, 2000. *Ogdon depo.,* p. 51, l. 9–p.52, l. 18; p. 64, l. 22–p. 65, l. 22. After that date, Mshow began experiencing major difficulties in finding investors willing to provide cash. *Ogdon depo.,* p. 66, l. 3–9; p. 73, l. 1–6. As a result, in mid to late 2000, Mshow was engaged in the vigorous pursuit of venture capital firms, companies involved in similar businesses,

and other potential investors and/or business partners. *Ogdon depo.*, p. 69, l. 20–p. 70, l. 10; p. 71, l. 10–23. One of the parties contacted by Mshow was Akamai, and in December, 2000, Mshow and Akamai entered into a series of agreements. *Ogdon depo.*, p. 64, l. 18–21, p. 77, l. 1–4; p. 78, l. 11–14. Akamai had, at that time, developed a competing technology for web meetings known as Netpodium. *Ogdon depo.*, p. 29, l. 11–p. 30, l. 8; p. 72, l. 13–18. The Akamai agreements (sometimes referred to hereinafter as the "Akamai Transaction") provided that Akamai would invest $5 million in Mshow if Mshow could raise $10 million from other investors. *Ogdon depo.*, p. 83, l. 14–21. The agreements also provided that Mshow would purchase Akamai's customer list and a non-exclusive license to use the Netpodium technology. Mshow agreed to pay Akamai $3.15 million by January 15, 2001 for the Netpodium license. *Ogdon depo.*, p. 85, l. 1–8; p. 87, l. 13–16; *Exhibits 10 and 11 to Trustee's Response to Motion for Summary Judgment (hereinafter "Trustee's Response.")*

As part of the structuring of the Akamai Transaction in December, 2000, Akamai requested that Blue Chip and Leach, who at the time were major investors and shareholders in Mshow, guarantee Mshow's $3.15 million obligation to Akamai. *Ogdon depo.*, p. 85, l. 14–p. 86, l. 1. The Akamai Transaction also provided that if Mshow did not make its payment to Akamai in January, 2001, Blue Chip and Leach could then delay enforcement of their guarantees in favor of Akamai by posting letters of credit for the benefit of Akamai in the amount of $1.575 million each. Blue Chip and Leach agreed to guarantee Mshow's payment to Akamai and, when Mshow failed to pay Akamai in January, 2001, agreed to post the letters of credit. *Exhibits 10 and 11 to Trustee's Response.*

The obligations from Mshow to Blue Chip and Leach, respectively, on account of their guarantees and their potential liability under the letters of credit were structured differently. On or about January 12, 2001, Blue Chip transferred $1.575 million to Mshow directly. Mshow placed this money in a restricted account and used it to collateralize its contingent liability to its bank on a letter of credit which Mshow caused to be issued for the benefit of Akamai. *Ogdon depo.* p. 235, l. 5–9; *Exhibit 13 to Trustee's Response.* Blue Chip and Mshow agreed that if Blue Chip was not repaid the $1.575 million by April 30, 2001, Blue Chip could receive, at its election, either equity or subordinated debt of Mshow. *Exhibit 12 to Trustee's Response.* Leach, on the other hand, at this same time in January 2001, caused a letter of credit to be issued directly for the benefit of Akamai. *Ogdon depo.*, p. 235, l. 2–4. The obligation of Mshow to repay Leach for his guarantee and/or letter of credit, if either was called upon, was secured by a first priority security interest in all of the assets of Mshow. The security interest to Leach was granted on December 6, 2000, under what was termed a "Reimbursement Agreement," at the same time that Leach signed his guarantee of Mshow's $3.15 million obligation to Akamai. *Exhibits 10 and 12 to Trustee's Response.*

In February, 2001, Mshow had not paid Akamai the $3.15 million, and Mshow was itself then short of operating funds. *Transcript of testimony of Robert Ogdon at 341 meeting, August 28, 2001*, p. 10, l. 18–23. Mshow decided at that time to obtain the needed funds by what came to known as the "Bridge Loans." The Bridge Loans,

dated February 26, 2001, and March 21, 2001, were intended to be a "bridge" to allow Mshow to reach a point where it could obtain other investors or be sold. *Ogdon depo.*, p. 82, p. 19–23; p. 109, l. 14–25; *Exhibit 27 to Trustee's Response.* The Bridge Loans took the form of convertible debentures issued to Leach, Blue Chip, Akamai and three other lenders. The debentures were secured by a first priority security interest in all of Mshow's assets. At the lenders' election, the debentures were convertible into common stock. *Exhibit 27 to Trustee's Response.* The initial balance of the Bridge Loans included $3.15 million, plus attorneys fees and interest, which was disbursed to Akamai. *Exhibit 13 to Trustee's Response.* The $3.15 million payment to Akamai was made by a transfer of $1.575 million directly from Leach to Akamai, *Exhibit 42 to Trustee's Response,* and the payment by Mshow to Akamai of the remaining $1.575 million. *Exhibit 43 to Trustee's Response.* This satisfied Mshow's $3.15 million obligation under the Akamai Transaction and resulted in the cancellation of the undrawn upon letters of credit that had been posted in connection with Blue Chip's and Leach's guarantees of Mshow's payment obligation under the Akamai Transaction. *Ogdon depo.*, p. 235, l. 13–14. The Trustee contends, and GDC does not appear to dispute, that the letters of credit were, in fact, cancelled prior to the payments to Akamai. *Exhibit 43 to Trustee's Re-*

*sponse,* p. 4, 8. Mshow itself received additional Bridge Loan disbursements of $3.6 million in March, 2001. The outstanding balance of the Bridge Loans was approximately $7 million at that time. *Exhibit 43 to Trustee's Response,* p. 6–7.

The effect of using Bridge Loan proceeds in the spring of 2001 to pay Akamai was to convert Mshow's unsecured, contingent liability to Blue Chip to a first-priority secured debt. There seems to be no question that, if Mshow was insolvent at the time, the Bridge Loans transferred to Blue Chip a security interest which would have been voidable as a preference under section 547 of the Bankruptcy Code in the bankruptcy of Mshow that followed. The Trustee argues that the Debtor's contingent obligation to Leach based on Leach's guarantee, which was secured at the outset when it was incurred on December 6, 2000, became an unsecured debt when Leach's letter of credit was cancelled shortly before the payment to Akamai with Bridge Loan Proceeds.[1] Then, when the Bridge Loans were executed and Akamai was paid, the Trustee contends that Leach also obtained a security interest which was voidable as a preference. *Exhibit 43 to Trustee's Response.*

After the Bridge Loans were executed, Mshow's financial position did not improve, and Mshow's management was unable to find a buyer for the company. *Ogdon depo.*, p. 116, l. 1–20. As a result, on July

---

1. This argument is apparently based on the language in paragraph 6 of the December 6, 2000, Reimbursement Agreement between Mshow and Leach that the Reimbursement Agreement would "continue in…effect until such time as (a) the Letter of Credit has expired by its terms or has been terminated or cancelled such that Lender has no further obligations thereunder…" However, this argument disregards the alternative language in paragraph 6 stating that the Reimbursement Agreement would continue until, "(b) Obligor [Mshow] has satisfied all of the Credit Obligations [which included any amounts advanced by Leach under his guarantee]." Notwithstanding this language in the Reimbursement Agreement, GDC appears to concede, for the purposes of its summary judgment motion, that there is at least a disputed issue of fact as to whether the Bridge Loans resulted in a preferential transfer to Leach.

19, 2001, the Chapter 11 petition was filed. In August, 2001, the Court approved an agreement for Debtor–in–Possession financing of a minimum of $2 million (the "DIP Loan"). Leach and Blue Chip were the lenders under the DIP Loan. The terms of the DIP Loan granted Leach and Blue Chip first position, priming liens in Mshow's pre– and post-petition assets. Furthermore, the terms of the DIP Loan allowed Mshow to use DIP Loan Proceeds to repay the Bridge Loans.

During the pendency of the Chapter 11 case, Leach and Blue Chip advanced approximately $4.9 million pursuant to the terms of the DIP Loan. Approximately $3.9 million of this amount was applied to the pre-petition Bridge Loans of Leach and Blue Chip. Thus, during the Chapter 11 case, the total amount of Leach and Blue Chip's Bridge Loans was reduced to $1,180,838 from their original balances of $5,150,000. The DIP Loan balance was increased to $4,935,162. The difference between the total amount lent under the DIP Loan and the total amount paid on the Bridge Loans was $966,000. This is the amount of "new cash" loaned to Mshow by Leach and Blue Chip during the Chapter 11 case. *Paragraphs 11 and 12 of the Amended Complaint; Proof of Claim No. 161 filed by Blue Chip in Case No. 01–20294.*

Ultimately this case did not proceed successfully under Chapter 11. In April, 2003, the Court held a hearing on the United States Trustee's motion to convert the case to Chapter 7. To resolve the Motion to Convert, a settlement agreement was negotiated. That agreement was among Blue Chip, Leach, Mshow, the Committee of Unsecured Creditors in Mshow's bankruptcy, and the United States Trustee. It was approved by the Court in June, 2003 (the "Settlement Agreement"). *Exhibit 10 to GDC's Motion for Summary Judgment.* The Settlement Agreement provided for the case to be converted to Chapter 7 and contained releases of any claims Mshow might have against Leach and Blue Chip. Pursuant to the Settlement Agreement, Leach and Blue Chip were to advance an additional $175,000 to the Chapter 7 Trustee for payment to unsecured creditors. Under this settlement, Leach and Blue Chip also were to pay certain other administrative expenses of the Chapter 11 case, up to $294,000. *Exhibit 10 to GDC's Motion for Summary Judgment.*

Of critical importance to various of the Trustee's claims for relief against GDC is the fact that GDC acted as counsel to both Mshow and Leach in late 2000 and early 2001, during the negotiation of the Akamai Transaction and the Bridge Loans. The representation by GDC of both Mshow and Leach during the pre-bankruptcy events in this case is undisputed. GDC began work for Mshow in 1999 as Mshow's primary corporate attorney. *Ogdon Depo.,* p. 55, line 24—p. 56, line 25. GDC was recommended to Mshow by Leach who was also using GDC as his attorney at the time. *Ogdon depo.,* p. 58, lines 5–15. The Leach and Blue Chip guarantees of Mshow's obligations to Akamai were structured by Roger Moody, CFO of Mshow, with GDC's help. *Ogdon depo.,* p. 108, lines 16–18. GDC represented both Leach and Mshow in the Akamai Transaction and in connection with the Bridge Loans. *Ogden depo.,* p. 136, lines 3–10; *Ogdon depo.,* p. 210, lines 8–9; *Exhibit 18 to Trustee's Response,* Answer to Interrogatory No. 16, and March 16, 2001 letters attached thereto; *Exhibit 19 and 23 to Trustee's Response* (copies of GDC bills for work done on Bridge Loans). Despite the dual repre-

sentation, GDC had assured Mshow that it could "manage" the conflict between Leach and Mshow. *Ogdon depo.*, p. 138, lines 17–22.[2]

Further, according to the Trustee, GDC continued to act as counsel for both Mshow and Leach at least until June, 2001, immediately prior to the Chapter 11 filing by Mshow. There is also some evidence in the record that GDC continued to represent Mshow as well as Leach even after the bankruptcy was filed, in connection with the DIP Loan. *See, e.g., Ogdon Depo.*, p. 150, line 20—p.151 line 16.

### B. The Plaintiff Trustee's Position

The Trustee contends that GDC, while owing professional duties to Mshow, acted to protect the interests of another client, Leach, contrary to the interests of Mshow. According to the Trustee, GDC undertook to structure the Bridge Loans so that Leach, Blue Chip and Akamai would receive security interests and/or payments from Mshow that were either fraudulent or preferential. Then, according to the Amended Complaint, GDC undertook to conceal the potentially avoidable fraudulent transfers or preferences from Mshow's bankruptcy counsel, the Unsecured Creditors' Committee and the Court. The Trustee argues that, as a result of GDC's divided loyalties and deception, Leach's avoidable pre-petition collateral position was never scrutinized and attacked. Furthermore, the Court was led to approve the DIP Loan which preferentially improved the secured positions of Leach and Blue Chip and allowed voidable

secured debts to be paid. As a further result of GDC's deception, the Trustee contends, the Unsecured Creditor's Committee and the U.S. Trustee were led to consent to the Settlement Agreement, and the Court was led to approve it, including the releases which shielded Leach and Blue Chip from any liability as a result of any voidable transfers made to them by Mshow.

### C. GDC's Position

GDC asserts three defenses, among others, which it claims are applicable to all of the Trustee's claims for relief. First it contends that the Trustee cannot establish that any damages to Mshow were caused by any of GDC's alleged misdeeds. Next, GDC argues that any claims of Mshow against it are barred by the Settlement Agreement. Finally, GDC argues that the doctrine of *in pari delicto* bars the Trustee from recovering any damages from GDC for wrongful conduct in which Mshow participated.

## II. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Bankruptcy Rule 7056, provides that summary judgment shall be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When applying this standard, the court

---

**2.** At least one of the means employed by GDC to "manage" its conflict was to recommend that Mshow retain an independent law firm, Chrisman, Bynum, and Johnson, to review the Bridge Loan documents and to give a "quick blessing" to the transaction. *Exhibit 19 to Trustee's Response; Deposition of Robert Riley Stark (excerpt attached as Exhibit 20 to Trustee's Response),* p. 58, l. 19—p. 60, l. 9.

must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288 (10th Cir.1991). In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or otherwise, demonstrate that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

### A. Lack of Causation

■ GDC strenuously argues that the Trustee is unable to prove any of its actions caused damage to Mshow and that there is no genuine issue of disputed fact concerning this. GDC argues that, since it was only carrying out its clients' business decisions, it cannot be held responsible for causing any damaging results of those decisions. The Trustee counters that had GDC not assisted in implementing the Bridge Loans, no preferential payments would ever have been made to insiders on those loans. Additionally, the Trustee argues that if the potential voidability of Leach and Blue Chip's security interest had been disclosed to the Court, the DIP Loan would never have been approved, and the Chapter 11 case would never have

been able to languish for two years, during which time Mshow's assets declined in value while administrative expenses accrued.

Viewed in the light most favorable to the Trustee, there are sufficient allegations before the Court, supported as required by Rule 56, that, if proven, would establish liability for causing, or aiding and abetting in causing, or conspiring to cause the harm complained of by the Trustee. The Trustee's allegations that GDC controlled how these loan transactions were structured and that such structure benefitted Leach at the expense of Mshow are supported as required in defending a summary judgment motion under Rule 56(e).

GDC has submitted no evidence regarding what would have happened to Mshow had the Bridge Loans and subsequent financing transactions *not* been structured in a manner so favorable to the insider lenders. It relies on the principle that, "Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex v. Catrett, supra.* However, the Trustee has come forward with facts supporting the conclusion that the structure of the loans and concealment by Mshow and GDC of the avoidance issues from Mshow's bankruptcy attorney had an adverse impact on Mshow. Douglas Jessop, the Chapter 11 attorney for Mshow, testified that had he known there was an argument that Leach or Blue Chip was "somehow infirm in their secured position" it "would have changed the...pre-[bankruptcy] filing dynamics" because "that's a lever that a debtor can use to perhaps extract additional concessions." *Deposition of Douglas Jessop ("Jessop Depo."),* page 40, lines 1–8. Mr.

Jessop also testified that had he known about the potential vulnerability of the security interest of Leach and Blue Chip, it might have affected the decision of whether to file for bankruptcy or not. *Jessop Depo.*, page 40, line 14. He further stated that he assumed the security interests of Leach and Blue Chip were beyond question based on his discussions with Roger Moody and on his assumption that a firm of GDC's caliber would have structured the loans to be unassailable in bankruptcy. *Jessop Depo.*, page 41, l. 19–24.

Because this matter arises on GDC's motion for summary judgment, the Court must construe these facts in a manner most favorable to the Trustee. When viewed in this light, the Trustee has demonstrated a disputed issue of fact on the question of whether GDC's conduct caused damage to Mshow. Therefore, GDC's summary judgment motion on this defense must fail.

### B. Settlement Agreement

■ Shortly before this case was converted from Chapter 11 to Chapter 7, the debtor-in-possession, the Unsecured Official Creditors' Committee, the U.S. Trustee, Blue Chip and Leach negotiated a settlement. *Exhibit 10 to GDC's Motion for Summary Judgment.* The Settlement Agreement provides, in Paragraph 3(a), for a release by Mshow (and parties, including the Trustee, claiming under Mshow) of Leach and Blue Chip and "each of their respective attorneys" from any and all claims relating to Leach and Blue Chip's relationship with Mshow or in connection with the DIP Loan, including claims for avoidance of fraudulent transfers or preferences. GDC argues that any claims by the Trustee against it were released by this agreement because the agreement re-

leases Leach *and its attorneys,* and GDC was acting as attorney for Leach. However, to the extent the release was intended to include attorneys as "released parties," the agreement operated only to release GDC from the claims of Mshow arising from GDC's conduct *as Leach's attorney,* and would not be applicable to any claims against GDC *as Mshow's attorney.* Therefore, it would be inappropriate to grant summary judgment to GDC on the basis of Paragraph 3(a) of the Settlement Agreement.

Even GDC acknowledges that the language in the Settlement Agreement is ambiguous as to the scope of the parties released. Paragraph 3(a) of the agreement appears to release Leach and Blue Chip's attorneys. However, paragraph 14 of the agreement states that, notwithstanding anything in the Settlement Agreement to the contrary, the release provisions are intended to benefit *only* Leach and Blue Chip. In light of conflicting provisions in what appears to be an ambiguous written agreement, the interpretation of the agreement is unsuited for disposition on summary judgment. *Anderson v. Eby,* 998 F.2d 858 (10th Cir. 1993).

### C. In Pari Delicto

■ The doctrine of *in pari delicto* is based on the equitable principle that when a participant in illegal, fraudulent or inequitable conduct seeks to recover from another participant in that conduct, the parties are both culpable, and the law will aid neither. It will, rather, leave them where it finds them. *Sender v. Kidder Peabody & Co., Inc.,* 952 P.2d 779 (Colo.App.1997)(citing *Bushner v. Bushner,* 134 Colo. 509, 307 P.2d 204 (1957) and *Abernethy v. Wright,* 27 Colo.App. 239, 148

P. 277 (1915)).[3] The Tenth Circuit has described the doctrine in the following terms: "one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Sender v. Simon,* 84 F.3d 1299 (10th Cir.1996)(citing *Merrill v. Abbott,* 77 B.R. 843, 857 (D.Utah 1987)(internal quotation marks omitted)).

### 1. *Bankruptcy and the In Pari Delicto Affirmative Defense*

 Except as expressly provided in the Bankruptcy Code—with respect to such matters as avoidance powers (Chapter 5), rejection of executory contracts (Section 365), or extension of limitations periods (Section 108)—a bankruptcy fiduciary, pursuant to section 541(a) of the Bankruptcy Code, succeeds to the assets and claims of a bankruptcy estate as they exist under non-bankruptcy law. It is not the prerogative of the bankruptcy courts to change this in the interest of improving the lot of creditors as that lot exists under applicable non-bankruptcy law. Except to the extent the Bankruptcy Code provides otherwise, the bankruptcy trustee or debtor-in-possession obtains only "legal and equitable interests of the debtor in property," pristine or blemished as such interests may be under non-bankruptcy law. If applicable non-bankruptcy state or federal law recognize an affirmative defense of *in pari delicto,* the bankruptcy trustee succeeds to the debtor's claims burdened with that defense.

The Tenth Circuit has held that a bankruptcy trustee, asserting the claims of a debtor under section 541(a) of the Bankruptcy Code, like any other assignee, stands in the shoes of his predecessor in interest, and thus is subject to all of the defenses to which the debtor would be subject, including *in pari delicto. Sender v. Simon, supra; Sender v. Buchanan (In re Hedged–Investments Associates, Inc.),* 84 F.3d 1281(10th Cir.1996). The reasoning of the Court of Appeals is that the language and legislative history of section 541(a) of the Code limits the estate's rights in a qualitative sense and establishes that the estate's rights are no stronger than they were when actually held by the debtor. *Id.,* at 1287.[4]

GDC argues that all of its conduct, which allegedly perpetrated wrongs on

---

**3.** As discussed *infra,* the claims asserted by the Trustee are property of the estate under section 541 of the Bankruptcy Code. State law determines the nature and extent of the debtor's interest in property of the estate. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), *In re Ogden,* 314 F.3d 1190 (10th Cir.2002). Therefore, Colorado law is applied herein to the analysis of the Trustee's claims and the defenses thereto.

**4.** The notion that a bankruptcy fiduciary succeeds to claims against third parties subject to the common law *in pari delicto* defense is not universally endorsed, at least in the recent scholarly literature. *See,* Davis, Jeffrey, "Ending the Nonsense: The In Pari Delicto Doctrine Has Nothing to Do with What is § 541 Property of the Bankruptcy Estate," 21 *Emory Bankr.Dev. J.* 519 (2005); Alam, Tan-

vir, "Fraudulent Advisors Exploit Confusion in the Bankruptcy Code: How In Pari Delicto Has Been Perverted to Prevent Recovery for Innocent Creditors," 77 *Am. Bankr.L.J.* 305 (2003). These commentators have argued that the *in pari delicto* defense focuses on past wrongful conduct of the debtor. Yet, the bankruptcy trustee, or debtor-in-possession, is a different legal persona. To handicap the bankruptcy fiduciary with the legacy of his predecessor's wrongs, so goes the argument, needlessly prejudices innocent creditors on whose behalf this fiduciary functions. This, the detractors of the *in pari delicto* defense maintain, is bad bankruptcy policy.

The premise of Professor Davis' position is that federal, not state, law governs what is "property of the estate" under section 541. According to Professor Davis, even if a debt-

Mshow, was engaged in as part of Mshow's alleged breach of its legal obligations to third parties, and therefore, the doctrine of *in pari delicto* bars Mshow, as a participant in wrongful conduct, from recovering any damages against GDC. That is to say, the very conduct of which the Trustee complains was part of his predecessor's own violations of its obligations to its creditors, i.e. preferring insider creditors at other creditors' expense while in a state of near, or actual, or deepening insolvency. Because the Debtor and GDC, by the Trustee's own allegations, engaged together in all such conduct, any claims Mshow or its successors might have against GDC arising from such conduct are subject to the *in pari delicto* defense.

■ To the extent the alleged wrongful joint conduct of Mshow and GDC may have given rise to claims directly in favor of Mshow's creditors for breach of fiduciary duty or other insolvency-related causes of action, Mshow, or successors to Mshow, are simply without standing to assert such claims. Such claims belong only to the creditors themselves. The United States Supreme Court so held more than thirty

---

or's pre-petition claim is subject to a valid *in pari delicto* defense under state law, federal law, informed by federal bankruptcy policy, should strip the *in pari delicto* defense from claims that pass from the debtor to the bankruptcy estate under section 541. Professor Davis acknowledges that this analysis has been expressly rejected by the Tenth Circuit in *Sender v. Buchanan*, 84 F.3d at 1285. The Tenth Circuit is joined by the Second, Third, Sixth, and Eleventh Circuits in this interpretation of section 541. *See, Official Committee of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*, 322 F.3d 147, 163–66 (2nd Cir.2003); *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 359 (3rd Cir.2001); *Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 133 F.3d 377, 380 (6th Cir.1997); *Official Committee of Unsecured Creditors of PSA Inc. v. Edwards*, 437 F.3d 1145 (11th Cir.2006).

In contrast to professor Davis, the Alam article maintains that the property passing to a bankruptcy estate is governed by state, not federal, law. However, Mr. Alam, like Professor Davis, would not, in most cases, recognize an *in pari delicto* defense to a bankruptcy fiduciaries' claims against third parties. While recognizing that claims that move by reason of section 541 to a bankruptcy estate are generally subject to affirmative defenses, Mr. Alam contends this is not the case where the affirmative defense is equitable in nature and recovery on the claim will benefit innocent creditors, as opposed to the wrongdoer predecessors of the bankruptcy fiduciary who were *in pari delicto*. Failure to recognize the *in pari delicto* defense in these circumstances

forces creditors of the wrongdoer/debtor to seek redress against third parties, not in the debtor's bankruptcy case, but outside bankruptcy, either directly or through class actions. Those alternative are both less efficient and likely to have creditors competing with equity holders who may also be aggrieved. This, Mr. Alam contends, is neither equitable, nor good bankruptcy policy.

Such a case for equitable bankruptcy policy is not supported by any reasoned explanation of how section 541 could move claims to the successor bankruptcy fiduciary, be it trustee or debtor-in-possession, subject to some state law affirmative defenses and unencumbered by others. It is precisely the lack of support in bankruptcy law for drawing such distinctions that leads the Tenth Circuit to sustain the *in pari delicto* defense in the *Hedged–Investments* case. The Tenth Circuit noted:
> ...the issue is not whether such an exception [freeing section 541 claims from the *in pari delicto* defense] would make good policy, but whether the exception can be found in the Bankruptcy Code.

84 F.3d at 1285–86.

Mr. Alam characterizes this very reasoning by the Tenth Circuit as a "misguided attempt to marry federal bankruptcy law and state common law principles." 77 Am.Bankr.L.J. at 343. His preferred alternative to the Tenth Circuit's so-called "misguided attempt" is a prescription for judges, in pursuit of equity, to create bankruptcy law where non exists. This court declines to do so. Whether subjecting the bankruptcy trustee to an *in pari delicto* defense is good policy or bad, it is good bankruptcy law.

years ago in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).

### 2. *Section 541 or Section 544?*

The Trustee counters GDC's *in pari delicto* defense by maintaining that he is asserting claims against GDC as a hypothetical "Colorado judgment creditor...under 11 U.S.C. § 544(a)...," and, as such, his claims against GDC are free from defenses that might otherwise have been asserted against his predecessor, Mshow. The Trustee argues that by bringing this complaint against GDC under his "strong-arm" subrogation powers of section 544(a) of the Bankruptcy Code, he is standing in the shoes of an ideal judgment creditor, who, having not participated in any fashion in wrongful conduct, is not *in pari delicto*, and not barred from recovery. *See, In re Porter McLeod, Inc.*, 231 B.R. 786 (D.Colo.1999) and *Anstine v. Alexander*, 128 P.3d 249 (Colo.App.2005).

 The Amended Complaint itself is void of any reference to either section 541 or section 544, so the court must analyze the nature of the claims to determine under which section they are asserted.[5] Under section 541(a) the bankruptcy estate formed upon the filing of a case is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." A trustee may pursue a claim of the debtor against a third party under this section because this language includes causes of action belonging to the debtor at the commencement of the bankruptcy case. *Sender v. Simon, supra*, at 1305(citing *Mixon v. Anderson (In re Ozark Restaurant Equip. Co.)*, 816 F.2d 1222 (8th Cir.1987)). Thus, a claim brought under section 541(a) is based on the trustee's succession to the rights that the debtor had against a third party.

 In contrast, a claim brought by a trustee under section 544(a) is a claim which devolves from subrogation of the trustee to avoiding powers of hypothetical creditors under non-bankruptcy law, i.e., of a judicial lien creditor, an unsecured creditor with a writ of execution returned unsatisfied, or a bona fide purchaser of real estate, whether or not any such creditors exist. The purpose of the section is to allow the trustee to avoid transfers of property of the debtor which would be avoidable under state law by such "ideal" creditors, or to confer upon the trustee a superior lien position to that, for example, of an unperfected secured creditor. As aptly stated in a recent decision from the Bankruptcy Court in the District of Columbia,

> [T]he statute [§ 544(a)] vests the trustee with the ability of a judgment lien credi-

---

**5.** To the extent that the cases of *Porter McLeod, supra*, and *Anstine v. Alexander, supra*, hold that a Trustee may simply elect to proceed under either section 541 or 544, without regard to the nature of the claim asserted, this Court respectfully disagrees. In this Court's view the better reasoning is reflected in the Tenth Circuit's discussion in *Sender v. Simon* in which the Court noted that "[the trustee's] brief repeatedly emphasizes he is pursuing claims of the partnership itself, not claims that belong to creditors of the partnership." *Sender v. Simon, supra,* at 1304. The Tenth Circuit then concluded that the claims brought by the trustee were properly asserted under section 541, not section 544, because they "[belonged] to the debtor entity itself, not the debtor's creditors individually." *Id.*, at 1305. Similarly, the Trustee's Amended Complaint herein asserts claims for damages inflicted on Mshow by the wrongful conduct of GDC. It is a classic case of a trustee pursuing claims *of the debtor* against a third party which are property of the estate by operation of section 541 of the Bankruptcy Code.

tor to attach or seize both tangible and intangible property transferred by the debtor to a third party prior to filing for bankruptcy, but it does not transform the trustee into a "super creditor" with the ability to raise causes of action separate from those possessed by the estate

. . . .

. . . .

There is no need to employ § 544(a) to bring into the estate that which is already in the estate under § 541 . . . .

*In re Greater Southeast Community Hospital Corp.*, 333 B.R. 506 at 520–21 (Bankr. Dist.Col.2005). Section 544(a) simply does not vest the trustee with property rights the debtor held prepetition. The trustee succeeds to those property rights under section 541(a). Section 544(a) vests the trustee with rights and powers, under non-bankruptcy law, of identified hypothetical

third-party creditors of, or transferees from, the debtor.

■■■ To assert that a judgment lien creditor under Colorado law would have the right, generally, to sue anyone against which its judgment debtor had any type of claim would obviate the need for post-judgment remedies such as garnishment and would turn established notions of standing on their head.[6] Absent a specific statute or case law right conferring standing on a creditor to sue for injuries to a debtor, the only way a trustee can assert a claim for such an injury is by asserting the debtor's direct right, succeeded to by the trustee, under section 541(a).

Having determined that the Trustee may only assert the claims of the Amended Complaint under section 541(a), the cases of *Sender v. Simon, supra,* and *In re Hedged–Investments Associates, supra,*

**6.** The Trustee makes no argument in support of his contention that he is proceeding under section 544(a) other than merely citing *In re Porter McLeod, supra* and *Anstine v. Alexander.* To the extent these cases interpret Colorado law as allowing judgment creditors standing to sue on any cause of action belonging to the judgment debtor, this Court must disagree. The only Colorado cases relied upon by the courts in the *Porter McLeod* and *Anstine v. Alexander* cases are *Ficor, Inc. v. McHugh,* 639 P.2d 385 (Colo.1982) and *J.H. Hincke Printing Co. v. Bailey,* 83 Colo. 242, 263 P. 719 (1928). Each of these cases involved very specific, limited situations in which state law does confer direct standing on creditors. In the *Ficor* case, the Colorado Supreme Court held that creditors of a corporation could assert the corporation's statutory right to sue a director who had voted for an improper liquidation of the corporation. The decision was based upon the court's view that the purpose of the statute was to protect creditors of the corporation. The *J.H. Hincke* case involved the rights of unsecured creditors to set aside a fraudulent transfer. The ability of creditors to avoid fraudulent transfers arises in very specific circumstances, now governed by the Colorado Uniform Fraudulent Transfer

Act, C.R.S. § 38–8–101, *et seq.* This statute vests a transferor's creditors with standing to sue a transferee where a transfer is for the purpose of hindering creditors or effects unfair discrimination among creditors of an insolvent debtor. Neither the *Ficor* case nor the *J.H. Hincke* case supports the proposition that Colorado law would generally allow judgment creditors of a corporation to sue any person who has tortiously injured the corporation.

Such a misinterpretation of Colorado creditors' rights law would arm a bankruptcy trustee with subrogation powers that are unknown to decades of application of the bankruptcy fiduciary's "strong-arm" powers under section 544(a) of the Bankruptcy Code or its predecessor in the Bankruptcy Act of 1898. The United States District Court's expansive interpretation of judgment creditor's rights under Colorado law in *Porter McLeod,* is, in fact, at odds with the Tenth Circuit in *Sender v. Simon, supra.* Similarly, the Colorado Court of Appeals' recent ruling in *Anstine v. Alexander* cannot be reconciled with the ruling of a different panel of that Court in *Sender v. Kidder Peabody, supra.*

provide that *in pari delicto* will bar the Trustee's claims where Mshow joined with GDC in the alleged wrongful conduct which forms the basis of the Trustee's claims. As stated above, the basis for all of the Trustee's claims is that Mshow committed wrongful acts, i.e., violation of the fiduciary duties it had to its creditors and shareholders or securities fraud, and that Mshow was either caused to commit such violations or was assisted in committing such violations by GDC. Therefore, unless some exception to the *in pari delicto* doctrine applies, GDC will be entitled to summary judgment on all of the claims against it.

### 3. *Adverse Interest Exception to the In Pari Delicto Defense*

■ When a corporate agent is acting adversely to the interest of a corporation, the knowledge and conduct of the agent may not be imputed to the corporation. *In re Stat–Tech Securities Litigation*, 905 F.Supp. 1416 (D.Colo.1995)(applying Colorado law and citing *McFerson v. Bristol*, 73 Colo. 214, 214 P. 395 (1923) and *Vail Nat'l Bank v. Finkelman*, 800 P.2d 1342 (Colo.App.1990)). *See, also, In re Fuzion Technologies Group, Inc.*, 332 B.R. 225 (Bankr.S.D.Fla.2005) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000)). Such instances may give rise to the "adverse interest" exception to the *in pari delicto* defense. GDC maintains, however, that the "adverse interest" exception to the *in pari delicto* defense is not applicable in this case.

■ To apply the adverse interest exception in this case, the Court must find that the officers and directors of Mshow who participated in the allegedly wrongful loan transactions were acting in their own interests, to the exclusion of the interests of Mshow. *See, In re CBI Holding Company, Inc.*, 318 B.R. 761 (S.D.N.Y.2004). A recent decision by the United States District Court for the District of Massachusetts contrasts the circumstances in which the adverse interest doctrine should be applied with those where is it inapplicable. In *Baena v. KPMG LLP*, 389 F.Supp.2d 112 (D.Mass.2005), the court, in applying Massachusetts' law, observed that the adverse interest doctrine overrides the *in pari delicto* defense only where the corporate agent is looting the corporation or where the agent is otherwise engaged in a fraud solely for his own benefit.

■ Viewing the record in the light most favorable to the Trustee on this issue, the Court finds that there is a disputed issue of fact as to whether Blue Chip and Leach, the directors who became secured lenders of Mshow, were acting in their own interests in structuring the loan transactions to benefit themselves. However, it is undisputed that there were other members of Mshow's management who participated in the decisions to enter into the Akamai Transaction and the Bridge Loans who did not stand to receive personal gain from the manner in which these transactions were structured, and thus, were *not* acting "adversely" to Mshow for the purposes of the "adverse interest" exception to the *in pari delicto* defense.

Roger Ogdon, CEO of Mshow, testified in his deposition that he and the entire board of directors of Mshow supported both the Akamai Transaction and the Bridge Loans and that both transactions served valid business purposes of Mshow. *Ogdon depo.*, p. 79, l. 3–10; p. 82, l. 3–18. The Akamai Transaction had many perceived benefits to Mshow, including a commitment to future investment and potential new customers. *Ogdon depo.*, p. 88, l. 7–

p.89, l. 18. The purpose for the Bridge Loans was to keep Mshow alive until it could find a possible buyer. *Ogdon depo.,* p. 105, l.1–6; p. 109, l.16—p. 110, l. 7; p. 111, l. 13–98; and p. 112, l. 9–19.

Ogdon testified that most of the negotiation of the Akamai Transaction and the Bridge Loans was conducted by Roger Moody, CFO of Mshow, with help from GDC. *Ogdon depo.,* p. 72, l. 22–79; p. 108, l. 16–18; and p. 136, l. 13–70. He also testified that the increase in the Leach and Blue Chip security interests for payments made to Akamai was managed by Moody as well as Blue Chip and Leach. *Ogdon depo.,* p. 148, l. 9–17. There is no evidence before the Court which would even hint at Moody's motives being other than performing his duties as an officer of Mshow.

Thus, the undisputed facts in the record indicate that the Bridge Loans and Akamai Transaction, even if they violated obligations of Mshow to its creditors, were undertaken for valid business purposes at the time they were made and were, at least partially, negotiated on behalf of Mshow by agents who were *not* acting in their own self interests. Neither Ogdon nor Moody was looting Mshow or perpetrating a fraud for his own benefit. Furthermore, both the Bridge Loans and the Akamai Transaction were approved by Mr. Ogdon and other directors of Mshow who were not personally interested in the transactions. In hindsight, one may question the wisdom of the business decisions made by the Mshow officers and board, with the aid of GDC, but for the purpose of applying the "adverse interest" excep-

tion to the *in pari delicto* doctrine, hindsight is not dispositive. The Trustee has pointed to no facts to contradict evidence that there were corporate actors of Mshow who approved the Bridge Loans and the Akamai Transaction for the purpose of realizing the value in Mshow by keeping the business going.

The evidence with respect to the DIP Loan and the Settlement Agreement presents a closer question. Mr. Ogdon testified that sometime during the period from February to April, 2001 (i.e., after the Akamai Transaction and the Bridge Loans, but before the bankruptcy filing) Blue Chip began asserting more control over Mshow through its board member, Tim Schigel, and Ogdon considered himself a "lame duck." *Ogdon depo.* pp. 181–184. Indeed, at the time of the bankruptcy filing, Schigel and Ogdon were the only remaining directors of Mshow. *Ogdon depo..* p. 127, l. 23–p.128, l. 4; p. 184, l. 22–24. Since Blue Chip arguably had even a more precarious security position based upon the structure of its original guarantee to Akamai[7], the actions taken by Mr. Schigel in connection with Mshow's DIP Loan (which may have improved the postpetition secured positions of both Blue Chip and Leach) and the Settlement Agreement (which released Mshow's claims against both Blue Chip and Leach) may well have been undertaken for the primary benefit of Blue Chip, not Mshow.

The DIP Loan, however, was approved by the Bankruptcy Court, upon notice to counsel for the Unsecured Creditors' Committee, the U.S. Trustee, and all of

---

**7.** The analysis prepared by GDC's attorneys in e-mails which constitute Exhibit 14 to the Trustee's Response to Summary Judgment, assesses the bankruptcy risks to Blue Chip as more severe than those facing Leach. Mr. Ogdon also recalled having the impression that Blue Chip's security interest was "less clear" in terms of bankruptcy "problems" than Leach's. *Ogdon depo.,* p. 175, l. 18–23.

Mshow's creditors. *See, Paragraph L of the Court's Final Order, dated August 20, 2001, authorizing the DIP Loan.* Although the Court may not have approved the structure of the DIP Loan had it known there was question about the avoidability of the pre-petition security interests of Blue Chip and Leach, it cannot be disputed that the purpose of the DIP Loan, at least in part, was to keep Mshow operating. Clearly, the Unsecured Creditors' Committee, the U.S. Trustee, and the Court understood that the DIP Loan served a valid business purpose of Mshow. Mr. Ogdon, who continued to act as the day to day supervisor of Mshow's bankruptcy, testified that the intent of Mshow's Chapter 11 case, at least in the initial stages, was to preserve a viable business with a viable product, valuable intellectual property and an important patent. It was his belief that Mshow could come out of Chapter 11 and grow back the business. *Ogdon depo.,* p. 127, l. 5–15. In fact, $966,000 in additional funds were advanced by Blue Chip and Leach under the DIP Loan which, presumably, were used for normal business expenses during the Chapter 11 case as well as expenses directly related to the administration of the estate. It cannot be said that the purpose of the DIP Loan was to loot Mshow in favor of its insider lenders to the exclusion of legitimate business purposes of the debtor-in-possession. Thus, the adverse interest exception cannot be applied to the DIP Loan and the *in pari delicto* defense bars the Trustee's claims in relation thereto.

The Settlement Agreement also was approved by the Court and was agreed to by the U.S. Trustee and the Unsecured Creditors' Committee. While there was no ongoing business of Mshow at the time, the Settlement Agreement was undertaken, at least in part, to benefit Mshow's estate.

The Settlement Agreement allowed the immediate conversion of the estate which, pursuant to section 546(a)(1)(B), extended the statute of limitations on certain avoidance claims which otherwise would have expired on July 19, 2003. The Settlement Agreement provided for a return to unsecured creditors that the parties to agreement purportedly believed was reasonable. It also provided for the payment of certain administrative claims. Thus, again, it cannot be said that the purpose of the Settlement Agreement was wholly adverse to Mshow's interest. The adverse interest exception does not apply to the Settlement Agreement and the *in pari delicto* defense bars these claims of the Trustee as well.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED, and judgment shall be entered in favor of Defendant Gibson Dunn & Crutcher, LLP, on all of the claims for relief set forth in the Trustee's Amended Complaint .