**In re MS55, INC. f/k/a MSHOW.com, Inc., Debtor.**

**Jeffrey L. Hill, Trustee, Plaintiff,**

**v.**

**Gibson Dunn & Crutcher LLP, Defendant.**

**Bankruptcy No. 01–20494 ABC.**
**Adversary No. 04–1650 ABC.**

United States Bankruptcy Court, D. Colorado.

Dec. 4, 2009.

D. Bruce Coles, Denver, CO, for Plaintiff.

Alexander R. Rothrock, Englewood, CO, Gregory J. Kerwin, Jessica B. Lee, Denver, CO, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RULING

A. BRUCE CAMPBELL, Bankruptcy Judge.

Plaintiff in this adversary proceeding is Jeffrey L. Hill, Chapter 7 Trustee (the "Trustee") of the bankruptcy estate of ms55, Inc. f/k/a MSHOW.COM, INC. ("MSHOW"). Defendant is the law firm of Gibson Dunn & Crutcher LLP ("GD & C").

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. §§ 157(a) and (b)(1). Adjudication of the claims in this adversary proceeding are either core proceedings or proceedings related to a case under title 11. By stipulation filed herein on November 3, 2009, as contemplated by 28 U.S.C. § 157(c)(2), the parties consented to the bankruptcy judge entering final orders and a judgment on the claims that were tried to this Court on September 14 through 18, 2009, subject to review under 28 U.S.C. § 158.

### CLAIMS AND DEFENSES

Two claims remain in this litigation.[1] The Trustee contends that in the course of

---

1. The Trustee's amended complaint asserted claims against GD & C for: (1) breach of fiduciary duty; (2) legal malpractice/negligence; (3) civil conspiracy; (4) aiding and abetting breach of fiduciary duties; (5) securities fraud; and (6) claim disallowance. Based on its *in pari delicto* affirmative defense, this Court entered summary judgment in GD & C's favor and dismissed the Trustee's first five claims, but denied GD & C's motion for summary judgment on the sixth claim. Thereafter, the parties stipulated to dismissal, without prejudice, of the sixth claim for relief. The Trustee then appealed this Court's summary judgment to the United States District Court. On appeal, the District Court addressed the Trustee's argument that the doctrine of *in pari delicto* did not bar the Trustee's third and fourth claims for relief, finding "dismissal of the Trustee's first, second, and fifth claims uncontested." *Hill v. Gibson, Dunn & Crutcher, LLP,* 2007 WL 2669150, *9 (D.Colo.2007). Finding that this Court erred as a matter of law in dismissing the Trustee's third and fourth claims for relief on the basis of *in pari delicto,* the District Court reversed this Court's summary judgment on those claims and remanded them for further proceedings. *Id.* at *15–16. The trial proceeded, therefore, only on the Trustee's claims for conspiracy and for aiding and abetting breach of fiduciary duty, "to the extent they implicate the fiduciary duty of [MSHOW'S] officers and directors to a hypothetical judgment lien creditor." *Id.* at *15.

representing MSHOW and one of its largest shareholders and lenders, who was also for a time a director of MSHOW, GD & C(a) aided and abetted and (b) conspired with directors and officers of MSHOW in breaching their fiduciary duties to general creditors of MSHOW. The alleged breach of fiduciary duty at issue was officers and directors causing MSHOW to make a fraudulent and/or preferential transfer in favor of one of their own at a time when MSHOW was insolvent. The Trustee claims that not only did GD & C assist officers and directors in this breach of fiduciary duty to creditors, but thereafter conspired to conceal this wrongdoing from this Court and parties in interest in MSHOW's subsequent Chapter 11 bankruptcy.

In its defense, GD & C maintains that the Trustee's claims must fail on varied legal as well as factual grounds. GD & C first argues that these claims, even if they have merit, are no longer held by the Trustee. They were transferred from the now superseded MSHOW Chapter 11 bankruptcy estate to third parties as part of a valid, court-approved settlement. Furthermore, they were released by the debtor-in-possession as part of that same settlement.

GD & C next argues that, under applicable Delaware law governing the "internal affairs" of MSHOW, a Delaware corporation, there exists no fiduciary duty of officers and directors to general creditors. There can therefore be no aiding and abetting or conspiring in a breach of such duty.

Third, GD & C contends that even if Colorado corporate law is applicable, the limited scope of the fiduciary duty of directors and officers of an insolvent corporation to general creditors under Colorado law does not encompass the conduct in question of MSHOW's officers and directors.

Lastly, GD & C maintains that even if Colorado law governs these claims, and even if the Court were to find MSHOW directors and officers breached their duty to general creditors of MSHOW, the Trustee cannot prove essential elements of aiding and abetting or conspiracy under Colorado law.

### Background Facts[2]

MSHOW was a technology company of the late 1990's that specialized in development of synchronized audio and video communication over the internet and telephone. While this enterprise never achieved profitable operations, it was of substance before its decline in 2000 and 2001, and ultimate unsuccessful attempt to reorganize in Chapter 11. From private investors it had raised in excess of $67 million. Its founders had previously developed and sold a technology company for $24 million. It had an active, sophisticated board. It engaged high profile, well-regarded legal counsel and investment bankers. Its business operations were global in scope. It employed approximately 250 people in offices in five states and Great Britain. Among its customers were some of the world's largest telecommunications and investment banking businesses.

By late 2000, MSHOW began to feel the adverse consequences of what was commonly referred to as the "bursting of the dot-com bubble," MSHOW's business model was in trouble. Investment capital to feed deficit operations pending development of real or imagined promising technology simply was not available. Viable strategic partners became difficult, if not

---

**2.** In addition to the fact findings contained herein, the Court incorporates by this reference as findings of fact the "Statement of Stipulated and Uncontested Facts" contained at pages 10 through 18 of this Court's Pretrial Order entered September 3, 2009, and docketed in this adversary proceeding as Docket # 159.

impossible, to locate. At its height, MSHOW was "burning through" $3 million per month of investment capital MSHOW suddenly confronted a shortage of cash and a need to downsize. In December 2000, management laid off approximately fifty people. Also in December 2000, MSHOW entered into a joint undertaking with a foreign competitor, Akamai Technologies, Inc. ("Akamai"). This arrangement, in addition to providing perceived operating advantages to MSHOW, contemplated further investment by Akamai in MSHOW. The Akamai transaction required MSHOW to pay $3,150,000 by January 15, 2001, for a customer list and license fee. In deferring this payment, Akamai was unwilling to rely on the strength of MSHOW's credit. It looked to and received credit support from MSHOW's two largest equity investors, Howard H. Leach and his living trust (collectively "Leach") and the Blue Chip Capital Fund III, Limited Partnership ("Blue Chip"). At the time both Leach and Blue Chip also were represented on MSHOW's board. Leach was a longstanding client of GD & C, who had introduced MSHOW to GD & C.

The credit support from Leach and Blue Chip of MSHOW's deferred payment obligation to Akamai came in two different formats. Leach simply guaranteed one-half of the obligation, to wit, $1,575,000. Leach's guaranty was backed by a letter of credit of like amount that he caused to be issued by his bank in favor of Akamai. MSHOW, in turn, promised to pay Leach $1,575,000 if this letter of credit was drawn on by Akamai or if Leach otherwise paid on his guaranty in favor of Akamai. This contingent reimbursement obligation of MSHOW to Leach was secured by MSHOW in favor of Leach in December 2000, by the grant and perfection of a security interest in MSHOW's intellectual property.

Blue Chip provided credit support for the other half ($1,575,000) of MSHOW's deferred payment obligation to Akamai without giving Akamai a guaranty. Blue Chip was prohibited by its own governing documents from guarantying obligations of the portfolio companies, like MSHOW, in which it had invested. Instead of a guaranty in Akamai's favor, Blue Chip agreed with Akamai to invest in MSHOW in the form of subordinated debt or equity an additional $1,575,000, which in turn, would assure MSHOW's ability to pay one-half of the deferred MSHOW obligation to Akamai. On January 12, 2001 Blue Chip moved $1,575,000 to an MSHOW restricted bank account. With these funds MSHOW was able to obtain a letter of credit from its bank in favor of Akamai. If and when this letter of credit was drawn by Akamai, MSHOW's issuer bank would pay itself from the MSHOW $1,575,000 restricted account. MSHOW in turn would owe Blue Chip $1,575,000 plus interest if Blue Chip elected to take its additional investment in MSHOW in the form of debt. This $1,575,000 contingent obligation of MSHOW to Blue Chip, first incurred by MSHOW in December 2000, was from its inception an *unsecured* obligation of MSHOW.

With Leach's and Blue Chip's credit support, Akamai agreed to extend the date by which MSHOW was to pay Akamai $3,150,000. MSHOW's management continued what was becoming a desperate effort to find new capital or a business interested in acquiring MSHOW. In late January 2001, MSHOW received both promising and discouraging news. Its investment bankers, Morgan Stanley Dean Witter, reported to the board that its efforts to raise capital or find a strategic partner for MSHOW had failed after approaching more than one hundred strategic, private equity, and venture capital investor candidates. At about the same

time MSHOW received a non-binding letter of intent and term sheet from Quest Digital Media ("QDM") proposing acquisition by QDM of MSHOW's assets in exchange for an equity position in QDM. This proposal would have fully provided for MSHOW's creditors and provided a chance for MSHOW's equity investors to recover at least a substantial portion of their investments. MSHOW's CEO, Robert Ogdon, testified that on consulting with MSHOW's investment bankers, QDM's proposal was valued in the $50 million range.

Faced with mounting pressure of a cash shortage, MSHOW's executive management consulted with GD & C for general legal advice concerning the scope of fiduciary duties of officers and directors once a corporation approached or reached insolvency. On or about January 23, 2001, GD & C addressed a memo to MSHOW's CEO and CFO explaining that under Delaware corporate law, as a company became insolvent the fiduciary duties of directors and officers expanded to run to creditors in addition to the corporation and its shareholders.

Unable to locate other sources to meet its immediate cash needs, MSHOW's management again turned to its largest investors. Once again, Blue Chip and Leach took the lead. In February 2001, Blue Chip and Leach agreed to a short term, secured loan facility with MSHOW under which each advanced $125,000 for thirty days. These advances were secured by MSHOW's principal assets with a security interest that was junior to the security interest in favor of Leach that had been granted the previous December.

At this same time MSHOW's management, Leach, and Blue Chip approached a larger group of the company's existing major investors and Akamai with a proposal for a larger secured "bridge loan" for purposes of (a) refinancing MSHOWs

$3,150,000 payment obligation to Akamai, which was soon to be owing by MSHOW to Leach and Blue Chip as a result of their credit support of the MSHOW/Akamai transaction; (b) refinancing Leach's and Blue Chip's thirty-day advances of $125,000 each to MSHOW from February 2001; and (c) bridging MSHOW's immediate cash needs while it either closed the QDM proposal or found an alternative investor, acquirer, or partner.

As this "bridge loan" proposal was being formulated and presented to the potential insider lending group, GD & C and MSHOW's management turned specifically to the question of whether, if, as part of the proposed secured bridge loan, MSHOW's contingent unsecured $1,575,000 obligation to Blue Chip was refinanced, might this part of the transaction be avoided as a preference or fraudulent transfer in the event MSHOW filed bankruptcy? On February 5, 2001, Blue Chip was advised of this inquiry by MSHOW's CFO, Roger Moody. GD & C concluded that, if bankruptcy ensued, the conversion of this portion of MSHOW's obligations to Blue Chip from unsecured to secured, "would likely be a preferential transfer," and that "there are serious fraudulent transfer issues." This conclusion, according to the testimony of Leach and MSHOW's CEO, Robert Ogdon, was shared with the board and the other prospective bridge lenders, without objection. According to Leach, the elevation of Blue Chip's prior unsecured position as part of the bridge loan simply reflected the insiders "pulling the same wagon" in hopes of rescuing MSHOW's substantial value as a going concern for the benefit of creditors and shareholders alike. To this end, in connection with the bridge loans, Leach and Blue Chip subordinated their existing security interests—Leach with respect to MSHOW's $1,575,000 December 2000 contingent reimbursement obligation and his

February 2001 $125,000 advance; and Blue Chip with respect to its February 2001 $125,000 advance to MSHOW.

Shortly before closing on the $125,000 February secured advances by Leach and Blue Chip to MSHOW, the nonbinding QDM letter of intent, which had contemplated acquisition of MSHOW, was withdrawn. With receipt of that news on or about February 20, 2001, MSHOW's management stepped up its cash conservation and downsizing efforts still seeking to maintain MSHOW's value as a going concern. Approximately one hundred additional employees were laid off. One U.S. office and MSHOW's office in England were closed. Payment of trade debt was systematically delayed.

On or about March 21, 2001, the bridge loan closed. GD & C represented MSHOW in this transaction and prepared the closing documents. The terms of the loan were dictated by MSHOW's executive officers, the participating insider lenders and Akamai, the only non-insider lender. Robert Stark, the GD & C attorney who coordinated the drafting and closing of the bridge loan, and Robert Ogdon, MSHOW's CEO, each testified that GD & C had no role in negotiating or otherwise determining the substantive terms of this credit. The bridge lenders and their participations that ultimately funded were: Leach—$2,573,870; Blue Chip—$2,573,870; Enron Broadband Investments Corp.—$500,000; Fredrick W. Gluck Living Trust—$130,000; Pita Management Ltd.—$260,000; and Akamai—$1,000,000. The total advanced on the bridge loans was $7,037,740. Of that amount, $3,637,740 was new cash to MSHOW and $3,400,000 refinanced MSHOW's December 2000 and February 2001 obligations to Leach and Blue Chip. The entire bridge loan was secured by substantially all MSHOW's assets. Of the $3,400,000 Leach/Blue Chip

debt that was refinanced, $1,575,000 had been unsecured.

The matter of bolstering a portion of Blue Chip's prior debt in the bridge loan was disclosed during negotiations of the bridge loan, but was not mentioned in the bridge loan documents. It was apparently perceived as merely incidental to putting all the bridge lenders on the same footing in the effort to rescue MSHOW while it still maintained some going concern value. On March 29, 2001, GD & C forwarded to MSHOW for circulation the notices, consents, resolutions, amendments to MSHOW's certificate of incorporation and prior shareholder agreements necessary to confirm and ratify the bridge loans and other corporate action taken in connection therewith. These documents made no mention of securing a portion of MSHOW's obligations to Blue Chip that had previously been unsecured.

The actual payment to Akamai of its $3,150,000 license/customer list fee, which had initially been agreed to in December 2000, was made at the first of April 2001. Letters to Blue Chip and Leach confirming that they were each the source of one-half of this payment and that $1,575,000 was being treated as an advance under each of their March 21, 2001 bridge loan notes were sent from MSHOW on April 2, 2001.

April 2001 did not provide MSHOW with an answer to its financial problems. In late April Leach resigned from MSHOW's board when he was named United States Ambassador to France. On May 2, 2001, the MSHOW board authorized its filing of Chapter 11. Later in May 2001, the balance of MSHOW's board resigned except Robert Ogdon, CEO, and Timothy Schigel, Blue Chip's representative on the board. About this same time GD & C withdrew from representing MSHOW, and MSHOW engaged bankruptcy counsel, Jessop & As-

sociates ("Jessop"). In turning over representation of MSHOW to Douglas Jessop, GD & C neither provided Jessop with GD & C's internal MSHOW files nor consulted at any great length with Mr. Jessop or others in his office. In particular, GD & C did not mention to Jessop that within the complex structure of the bridge loans was a transfer to Blue Chip that GD & C had advised MSHOW might well be avoidable in the event of a bankruptcy. Mr. Stark of GD & C explained this as a matter of professional responsibility. He testified that it would violate his ethics to discuss a client's affairs with successor counsel without having been instructed by the client to do so. Such ethical sensitivity was convenient, given GD & C's prior and ongoing representation of Leach, who was closely aligned with Blue Chip throughout his dealing with MSHOW in late 2000 and 2001. Both Leach and Blue Chip were major lenders to MSHOW, a financially distressed enterprise with potentially adverse interests.

GD & C was less helpful with the transition of MSHOW's counsel than might have been expected. However, GD & C did not conceal from Jessop the possibly avoidable transfer resulting from collateralizing MSHOW's December 2000 $1,575,000 contingent unsecured obligation to Blue Chip as part of the March 2001 bridge loans. From the start of its engagement, Jessop had access to the documentation for the December 2000 MSHOW/Akamai transaction; the February 2001 Leach/Blue Chip secured advances to MSHOW; and the bridge loans.

By mid-May 2001, Jessop had, as part of its investigation of MSHOW's capital structure, fully charted the participations in the March 2001 bridge loans, including a column for "other advance (potential)," listing Blue Chip and Leach each for $1,575,000. In checking UCC filings, on May 21, 2001, Mr. Jessop noted in an email

to one of the lawyers in his office, "I'm particularly interested in the date of the UCC's for the financing liens of the Leach Trust and Blue Chip Capital Fund in December 2000, February 2001, and March 2001." In August 2001, Jessop sent counsel for the MSHOW unsecured creditors committee a set of the December 2000 MSHOW/Akamai documents, insofar as they related to credit support by Leach and Blue Chip. Among the list of twelve documents were both Leach/Akamai and Blue Chip/Akamai credit support letter agreements. Also included were a grant of security interest and secured note in favor of Leach. Conspicuously absent was any document referring to security in favor of Blue Chip. MSHOW's own statement of financial affairs, filed with its bankruptcy petition on July 19, 2001, discloses, in response to Item 10's inquiry into non-ordinary course collateral transfers within one year of filing, that Leach was granted security interests in December 2000, February 2001, and March 2001; Blue Chip is listed as having received collateral transfers only in February 2001 and March 2001.

Mr. Jessop testified that he learned of the March 2001 bridge loan potential preference or fraudulent transfer to Blue Chip only after this case was converted to Chapter 7 in 2003. Assuming this is true, it is not so because the transfer was concealed from Jessop by GD & C.

The two remaining members of MSHOW's board at the time of the Chapter 11 filing, Robert Ogdon and Timothy Schigel, clearly were aware that the collateralization of MSHOW's December 2000 $1,575,000 obligation to Blue Chip through the March 2001 bridge loans might be avoided in MSHOW's bankruptcy. The issue had expressly been brought to the attention of each after GD & C had analyzed the question in February 2001. There is no indication in the evidence be-

fore the Court whether or not these gentlemen discussed this issue with anyone between the time the bankruptcy filing was authorized in early May 2001, and conversion of the Chapter 11 to Chapter 7 in June of 2003.

Shortly after filing Chapter 11, MSHOW applied to the Court for authorization to provide its prepetition bridge lenders with adequate protection for use of cash collateral and to undertake debtor-in-possession financing. The post-petition financing was to be provided by Leach and Blue Chip. Under the debtor-in-possession financing arrangement, MSHOW was permitted to repay the bridge loans from cash collateral. In MSHOW's application for debtor-in-possession borrowing and cash collateral use, MSHOW represented to the Court and creditors that the liens and security interests securing the bridge loans "are not subject to any claims by the Debtor." In the Court's August 20, 2001 Order authorizing post-petition borrowing, it determined that all liens securing the pre-petition bridge loans "are deemed to be irrevocably and unconditionally valid, perfected, and unavoidable," subject to the unsecured creditors' committee's right to attack such liens for stated limitations periods.

The accuracy of the representation that the bridge loans were not subject to any claims by MSHOW as debtor-in-possession is, to this day, uncertain at best as it relates to bridge lender Blue Chip. That very uncertainty had been highlighted by GD & C in February 2001, and communicated to Robert Ogdon and Timothy Schigel, both of whom continued on MSHOW's board through the time that the post-petition financing was approved and advanced. When the post-petition borrowing was applied for in August 2001, GD & C stood by as MSHOW made the potentially mislead-ing representation concerning $1,575,000 of the bridge loans not being subject to claims by the Debtor. By this time GD & C no longer represented MSHOW; it then represented Leach, a past director, bridge lender and, along with Blue Chip, a post-petition lender.

In September 2001, MSHOW, together with Blue Chip and Leach, as plan proponents, filed a proposed plan of reorganization and disclosure statement. The proposed plan would have cancelled all of MSHOW's then outstanding capital stock, reissued stock to its secured creditors, paid tax and wage priority claims in full, and paid an estimated $.02 on the dollar to $8 million of unsecured claims. This proposed disclosure statement addressed possible "Avoidance Actions." It identified "approximately $3 million of transfers made to insiders," and concluded, "the Plan Proponents [MSHOW, Blue Chip and Leach] do not believe that any of these payments would be recoverable, ... The Plan Proponents have not identified any Avoidance Actions or other claims against the Bridge Loan Lenders."

Leach testified that when the bridge loans were made in March 2001, the entire board was advised that, in the event of an MSHOW bankruptcy $1,575,000 of Blue Chip's participation in the bridge loans might be set aside. Robert Ogdon and Timothy Schigel, each of whom signed the disclosure statement as proponents of the September 2001 proposed plan, were direct recipients of GD & C advice that Blue Chip's security interest for the bridge loans might be avoided to the extent of $1,575,000.

Leach testified that he never read the September 2001 proposed disclosure statement. GD & C, his lawyers, reviewed it for him, and he simply followed Blue Chip's lead as a plan proponent.[3] Oscar

---

3. At that time Mr. Leach was otherwise fully engaged in France as this country's ambassa-dor in the immediate aftermath of the 9/11 World Trade Center attack.

Garza, the GD & C bankruptcy partner who reviewed the disclosure statement on Leach's behalf, testified that he never made the connection between the disclosure statement's recitation that the plan proponents knew of no claims the Debtor had against bridge lenders and GD & C's advice to MSHOW to the contrary eight months earlier, of which he was aware in early March of 2001. He personally never followed up on whether MSHOW's contingent, unsecured obligation to Blue Chip, in fact, got refinanced on a secured basis in the bridge loans. That was his partner, Mr. Stark's, concern.

The September 2001 proposed plan and disclosure statement was abandoned when MSHOW received an offer to purchase its assets in the spring of 2002. That sale was approved by the Court at the end of April 2002, and closed shortly thereafter. In November of the same year, the U.S. Trustee filed a motion seeking to have the MSHOW Chapter 11 proceedings converted to Chapter 7. In January 2003, MSHOW and Blue Chip filed a jointly proposed liquidating plan in lieu of conversion sought by the U.S. Trustee.

MSHOW and Blue Chip's opposition to conversion was withdrawn and the case converted in connection with a settlement agreement among the Debtor, Blue Chip, Leach, the Unsecured Creditors Committee, and the United States Trustee. This settlement agreement provided that MSHOW would transfer to the post-petition lenders, i.e. Blue Chip and Leach, all the Debtor's cash and other assets except "Avoidance Actions." MSHOW and its creditors' committee, on the one hand, and Blue Chip and Leach, on the other, exchanged comprehensive mutual releases, including releases of Blue Chip and Leach and their agents and attorneys from any claims under section 544 of the Bankruptcy Code. As part of this settlement Blue Chip and Leach made various payments:

$60,000 for "employee stay bonuses;" $60,000 for unpaid Chapter 11 administrative expense including committee counsel, and funding post-conversion investigation by the Chapter 7 Trustee of "Avoidance Actions;" $175,000 set aside for distributions to unsecured creditors in the contemplated superseding Chapter 7 case; $128,000 for Debtor's Chapter 11 counsel; and a maximum of $46,000 for secured tax claims subsequently determined to have priority over the pre- and post-petition secured lending to MSHOW by Blue Chip and Leach. On June 18, 2003, the Court approved this settlement, and MSHOW's Chapter 11 bankruptcy case converted to Chapter 7 on June 20, 2003.

## DISCUSSION

### The Trustee's Standing as Real Party in Interest

GD & C's argument that the Trustee lacks standing to bring the remaining claims in this adversary proceeding is based on paragraph 2 of the June 2003 settlement agreement which provided that all assets held by or under the control of MSHOW were transferred to Blue Chip, as agent for itself and Leach, "excepting only the Avoidance Actions . . . ." GD & C asserts that the remaining claims asserted by the Trustee are state law tort claims, not avoidance actions, and accordingly, they were transferred to Blue Chip in 2003 when the settlement agreement became effective. The term "Avoidance Actions" is a defined term in the settlement agreement. Paragraph M. of the Recitals states that the January 21, 2003 Liquidating Plan filed by Blue Chip and MSHOW "set[s] forth the proposed distribution mechanism for [MSHOW's] assets and the prosecution of potential avoidance actions pursuant to, *inter alia*, Section 544, 547, 548 and 550 of the Bankruptcy Code (the 'Avoidance Actions')."

■ The Trustee does not directly seek the invalidation, setting aside, or annulment of a past transaction, the familiar meaning customarily attached to the term "avoidance" in the bankruptcy context. Instead, he seeks money damages for conspiring to commit and/or aiding and abetting wrongful conduct, the breach of officers' and directors' fiduciary duties. Nevertheless, the source of the Trustee's authority to bring these claims is the "strong-arm" powers of section 544 of the Bankruptcy Code, as was specifically determined by the United States District Court in reversing this Court's summary judgment on these claims. *Hill v. Gibson, Dunn & Crutcher (In re MS55, Inc.),* 2007 WL 2669150 (D.Colo.2007). The defined term "Avoidance Actions" in the Settlement Agreement is thus ambiguous: while the Trustee's claims do not fall under the most commonly understood meaning of "avoidance actions," they are actions brought "pursuant to Section 544 ... of the Bankruptcy Code."

■ No evidence was presented concerning what the parties to the settlement agreement intended the term "Avoidance Actions" to encompass; however, what the parties intended is of no consequence because, even if these section 544 tort claims were intended to be transferred from MSHOW as part of the 2003 settlement agreement (i.e., as an asset of MSHOW other than "Avoidance Actions"), this purported transfer does not provide a lack of standing or lack of real party in interest defense to GD & C. These claims simply were not legally transferable from a bankruptcy fiduciary, MSHOW as debtor-in-possession, to individual creditors in their capacity as such.

■ In *Delgado Oil Co., Inc. v. Torres,* 785 F.2d 857 (10th Cir.1986), the Tenth Circuit discussed the type of breach of fiduciary duty claim raised by the Trustee. This claim arises under Colorado common law which gives creditors of an insolvent corporation the right to sue directors of the corporation for breach of the directors' duty not to favor the directors' interests over creditors' claims. *Alexander v. Anstine,* 152 P.3d 497, 502 (Colo.2007). Though a claim for breach of this fiduciary duty does not explicitly seek to "avoid" a transfer, it is aimed at the same result: to restore the value of the property transferred to the estate for the benefit of all creditors similarly situated. *Delgado,* 785 F.2d at 861. Presumably for this reason, the *Delgado* case repeatedly describes such a claim as one to recover "preferential transfers of the debtor's property." *Id.* at 860. In addition, once a bankruptcy case is filed, the Tenth Circuit held, this claim may be asserted only on behalf of the creditor body as a whole, and only by a bankruptcy trustee or debtor-in-possession. *Id.* The negation of an individual creditor's right to recover against a director once a bankruptcy is filed, "occurs to satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike." *Id.* at 862.

■ This policy—of treating similarly situated creditors alike, and preventing the favoring of a single creditor over the creditor body as a whole—prevents a bankruptcy trustee from transferring the powers conferred upon him by sections 544, 545, 547, 548, 549, and 553 of the Bankruptcy Code to an individual creditor, unless that creditor is pursuing relief for the benefit of the estate. *See, Citicorp Acceptance Co. v. Robison (In re Sweetwater),* 884 F.2d 1323 (10th Cir.1989). The *Sweetwater* case dealt with appointment of an estate representative to pursue such claims pursuant to 11 U.S.C. § 1123(b)(3)(B), a situation not presented here, but its holding is based on the "theoretical underpinning of all of [the avoiding powers]" which is "equal treatment among creditors by forcing those who have received an unfair advantage to disgorge the ill gotten gains."

884 F.2d at 1329 (quoting R. Aaron, Bankruptcy Law Fundamentals § 10.01 (Clark, Boardman Co.)). Other courts have held that, absent appointment of a qualified representative of the estate pursuant to section 1123(b)(3)(B), there is no statutory mechanism for transferring the trustee's Chapter 5 powers to a single creditor which does not act to benefit the estate. *See, Fleet Nat'l Bank v. Doorcrafters (In re North Atlantic Millwork Corp.)*, 155 B.R. 271, 281 (Bankr.D.Mass.1993); *Consolidated Pet Foods, Inc. v. Millard Refrigerated Services, Inc. (In re S & D Foods, Inc.)*, 110 B.R. 34, 36 (Bankr. D.Colo.1990); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930, 937 (Bankr.E.D.N.Y. 1981).

Because of the nature of the Trustee's claims, they may only be brought by a trustee or debtor-in-possession once a bankruptcy case is filed. *Delgado*, 785 F.2d at 860. MSHOW, as a debtor-in-possession in a Chapter 11 case, was incapable of transferring these claims to Blue Chip, and any attempted transfer was ineffective. *Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.)*, 58 B.R. 357, 358 (Bankr.S.D.Tex. 1986). Therefore, the 2003 settlement agreement did not divest the Trustee of standing to bring the remaining claims in this adversary proceeding.

### The Release

■ GD & C has raised a second affirmative defense arising from the June 2003 settlement agreement among MSHOW, the U.S. Trustee, the Creditors Committee, Blue Chip, and Leach. Pursuant to paragraph 3 of that settlement agreement, MSHOW, "the estate or anyone acting by, on behalf of or through [MSHOW] or the estate" and their "successors and assigns" released Blue Chip and Leach, *and their attorneys*, from any liability "relating to, arising from or in connection in any way" with Blue Chip's and Leach's relationship with MSHOW and/or its bankruptcy estate, and the DIP Financing Agreement, "including any claims arising under or relating to Sections 502, 510, 523, 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code." The release covered "any matter, act, omission, cause, event, whichever has occurred or which has been done, or suffered to be done up to the Effective Date" of the settlement agreement, which was June 18, 2003.

■ The claims asserted by the Trustee in this case all stem from the March 2001 security interest granted to Blue Chip which the Trustee claims was an avoidable transfer and was a transfer in breach of the MSHOW officers' and directors' fiduciary duties. There is no question that these claims are claims "relating to, arising from or in connection" with the relationship between Blue Chip and Leach and MSHOW and/or its bankruptcy estate. Accordingly, the settlement agreement released Leach and his attorneys from any liability for these claims. Therefore, to the extent that alleged liability of GD & C arises from actions it took *as Leach's attorney*, the release bars such claims. The release does not purport, however, to release GD & C from liability for actions it took as MSHOW's attorney. The parties stipulated, and the evidence at trial showed, that GD & C ceased representing MSHOW in late April 2001. Any actions taken by GD & C after late April 2001, were done in its capacity only as Leach's attorney, and the release precludes the Trustee from asserting liability against GD & C for such actions. Accordingly, GD & C has been released from any liability resulting from the failure to disclose in documents filed in this bankruptcy case the possible avoidability of Blue Chip's security interest and from any liability for any misleading statements in such documents. By the time these actions were taken, GD & C was acting only as Leach's

attorneys. Conversely, actions taken by GD & C from December 2000 through late April 2001, were in its capacity as MSHOW's attorneys. The release by its own terms does not cover the remaining claims in this litigation to the extent they arise from the securing through the bridge loans in March 2001, of Blue Chip's previously unsecured claim against MSHOW. GD & C was not then acting as Leach's attorneys, but as MSHOW's.[4] The Court will thus consider only whether GD & C's conduct in drafting and closing the bridge loans and in the transition from its representation of MSHOW to Jessop's amounted to aiding and abetting, or conspiring with, MSHOW's officers and directors in breaching fiduciary duties to MSHOW's creditors.

### Choice of Law on Directors' Fiduciary Duty to Creditors

 In order to sustain his claims that GD & C aided and abetted or conspired with MSHOW's corporate fiduciaries in breaching their duty to unsecured creditors, the Trustee must first show that MSHOW's officers and directors owed a duty to unsecured creditors. If there is no duty, then GD & C can have no liability for aiding and abetting or conspiracy to breach it. GD & C argues that the scope of MSHOW's officers' and directors' duties to creditors is controlled by Delaware law, as MSHOW was a Delaware corporation. The Trustee argues that Colorado law applies. The distinction may be critical because under Delaware law, creditors of an insolvent corporation, or a corporation operating within the "zone of insolvency," have no right to assert direct claims for breach of fiduciary duty against corporate directors. *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,* 930 A.2d 92, 101–103 (Del. 2007) (*"Gheewalla"*).[5] Under Colorado law, by contrast, directors of an insolvent corporation owe a *limited* duty to creditors

4. In testimony of its attorneys, GD & C acknowledged that it failed to observe prescribed ethical formalities and to retain appropriate informed, written waivers as it shifted its professional engagement from Leach to MSHOW, and then back to Leach. The evidence is clear, however, that GD & C represented Leach before it was engaged by MSHOW; that GD & C represented MSHOW, to the exclusion of Leach, in connection with the bridge loans in early 2001; and that GD & C represented Leach, to the exclusion of MSHOW, in dealing with MSHOW after April 2001.

5. The Trustee dismisses *Gheewalla* rather summarily, arguing that even if Delaware law controls, *Gheewalla* does not defeat his claims because Delaware law recognizes the right of creditors of an insolvent corporation to bring *derivative,* as opposed to direct, claims on behalf of the insolvent corporation, against directors for breach of their fiduciary duties. 930 A.2d at 103. As pointed out by the District Court in the earlier appeal from this Court, the distinction between direct and derivative claims is crucial in this context. This court dismissed all of the Trustee's derivative claims *on behalf of MSHOW* because they were barred by the doctrine of *in pari delicto.* The Trustee did not contest this ruling on appeal, instead choosing to argue that his third and fourth claims—which he asserted were *direct* claims on behalf of creditors— were properly brought under 11 U.S.C. § 544(a) and were not subject to the *in pari delicto* defense. The District Court agreed with the Trustee and remanded for trial only these two claims and only "to the extent they implicate the fiduciary duty of [MSHOW'S] officers and directors *to a* hypothetical judgment lien *creditor." Hill v. Gibson, Dunn & Crutcher (In re MS55, Inc.),* 2007 WL 2669150, *15 (D.Colo.2007)(emphasis added). Moreover, the duty owed by directors to creditors (under Colorado law) and the duty owed by directors to the corporation is fundamentally different. The duty to creditors of an insolvent corporation requires a director not to favor his own interests to the detriment of creditors' interests. The duty to the corporation requires the director to exercise his business judgment in the best interest of the corporation for the benefit of all those having an

not to favor their own interests at the expense of creditors. *Alexander v. Anstine*, 152 P.3d 497, 502 (Colo.2007).

To resolve this question of which state's substantive law governs the remaining claims in this litigation, this Court will apply the choice of law rules of Colorado. *Loveridge v. Dreagoux*, 678 F.2d 870, 877 (10th Cir.1982)(federal court follows conflicts of laws rules of the forum state where federal jurisdiction is based on federal question).[6] The Colorado Supreme Court has utilized the "internal affairs doctrine," as set forth in the Restatement (Second) of Conflict of Laws section 309 ("Restatement"), to determine the substantive law which governs the "rights and obligations between corporate creditors on the one hand, and officers, directors and shareholders of the corporation on the other." *Ficor v. McHugh*, 639 P.2d 385, 391 (Colo.1982).

Section 309 of the Restatement, provides that

> The local law of the state of incorporation will be applied to determine *the existence and extent of a director's* or officer's *liability to* the corporation, its *creditors* and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

(Emphasis added.) [7]

---

interest in it. *Gheewalla*, 930 A.2d at 103. A duty to act in the best interests of creditors may sometimes be in conflict with the duty to act in the best interest of the corporation, and this conflict is the very basis for the Delaware Supreme Court's decision not to allow creditors to assert direct claims against directors for breach of fiduciary duty. *Id.*

6. The Court recognizes that there are two lines of authority regarding how bankruptcy courts are to determine choice of law questions where jurisdiction over state law claims is based on bankruptcy law. The first applies *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) to bankruptcy as well as diversity jurisdiction and looks to the choice of law principles of the forum state. *See, In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–206 (4th Cir.1988) and *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599 (2nd Cir. 2001). The second applies a more flexible approach, holding that a bankruptcy court may exercise its "independent judgment" and choose the substantive law of the state which it deems appropriate, usually based on an analysis of the which state has the "most significant contacts" or "most significant relationship." *See, Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)*, 59 F.3d 942, 948 (9th Cir.1995). Based on the *Loveridge* case, which applied the conflicts law of the forum state to state law claims that were pendent to a federal securities law claim, this Court believes that the Tenth Circuit would apply the "forum state" rule where jurisdiction is conferred by the Bankruptcy Code, but the claims to be determined are state law claims. Even courts applying the "independent" federal choice of law analysis give considerable weight to the principles set forth in the Restatement (Second) of Conflict of Laws. *See, Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.)*, 87 B.R. 154 (Bankr.D.Colo.1988); *In re Lindsay*, 59 F.3d at 948. Because both Colorado and the general conflicts law set forth in the Restatement adopt the "internal affairs doctrine" when dealing with liability of corporate directors to creditors, the Court finds that the "internal affairs doctrine" is the controlling choice of laws principle under either line of analysis.

7. Section 6 of the Restatement lists the following factors to be considered in making a choice of laws determination:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

Accordingly, under the internal affairs doctrine, Delaware law governs the determination of the existence of MSHOW's directors' liability to MSHOW's creditors, unless, with respect to this issue, some other state has a more significant relationship to the parties and the transaction. *Ficor*, 639 P.2d at 391. The Trustee argues that the *Ficor* case itself mandates that Colorado law should apply in this case. In *Ficor*, the Colorado Supreme Court applied a Colorado statute regarding directors' liability in connection with dissolution of a corporation formed under the law of the District of Columbia. The *Ficor* court's decision to apply Colorado law was based, however, on the facts that the corporation was formed solely for the purpose of acquiring and developing land in Colorado, all of its activities were conducted in Colorado, and all of its assets located in Colorado. *Id.* The *Ficor* court also noted that the corporation at issue was a "straw party," a "shell corporation," "engage[d] in no trade or business activities," formed solely as a vehicle to acquire Colorado real property and then immediately to convey it to its principals. *Id.* at 387 and n. 1. Finally, the Court emphasized that the District of Columbia statutes concerning dissolution were very similar to Colorado's and that the choice of law question in *Ficor* would not determine the outcome of the case. *Id.* at 390, 391 and 392 n. 11, 12, and 13.

The Colorado Supreme Court necessarily reached the result it did in *Ficor* by concluding that, with respect to the particular issue involved, and applying the principles of sections 6 and 309 of the Restatement, Colorado's relationship to the parties and the transaction justified an exception to the general rule that the liability of a director to a corporation's creditors is governed by the law of the state of incorporation. The fact that no other state had any connection whatsoever to the purpose, operation, or assets of the corporation was determinative.

The facts of the instant case compel a different conclusion when applying the Restatement's internal affairs doctrine. In contrast to the corporation in *Ficor*, MSHOW engaged in legitimate and substantial business operations throughout the United States and worldwide. Though its corporate headquarters were located in Colorado, it had four other offices in the U.S.—in Washington, Illinois, Texas and California—and one in the United Kingdom. Its customers included Singapore Telecom and telecommunications companies in France and Italy. Its directors were from various states. The claims register in MSHOW's Chapter 11 case reveals creditors from 24 different states, the United Kingdom, and Canada.

Restatement section 309 directs that the law of the state of incorporation applies, unless with respect to the particular issue involved, some other state has a more significant relationship with the parties and the transaction. In this case, the particular issue involved is asserted liability in connection with discharge of the duties of corporate fiduciaries. Given the scope of MSHOW's business and operations, the Court does not find that Colorado had a more significant relationship with respect to this issue than did Delaware. The factors listed in section 6 of the Restatement, particularly the protection of justified expectations and the need for certainty and predictability of result, weigh heavily in favor of applying the law of the state of incorporation to the question of the scope

(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

of corporate fiduciaries' duties. Otherwise, a director or officer of a corporation could be faced with conflicting obligations when attempting to discharge the duties that arise from this relationship to the corporation and its constituents. *See, Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982). It would simply not make sense to expect MSHOW's directors to evaluate their conduct and business decisions in light of the law in multiple states and countries before taking action.

Section 6 of the Restatement also directs a court to follow statutory directives of the forum state on choice of substantive law. The Colorado statutes governing foreign corporations which were in effect at the time *Ficor* was decided provided that a foreign corporation "shall be subject to the same duties, restrictions, penalties and liabilities imposed upon a domestic corporation of like character." C.R.S. 7–9–104 (1982). By 2001, the time the operative facts of this case occurred, Colorado law had been amended to provide that the Colorado corporate statutes "[do] not authorize this state to regulate the organization or internal affairs of a foreign corporation." C.R.S. 7–115–105(3) (2001). This change in the law signals the Colorado legislature's view that it favored the application of the law of the state of incorporation to matters concerning corporate governance. The amendment was conceivably intended to overrule *Ficor's* application of Colorado statutes to the internal affairs of a foreign corporation.

Applying the rule of section 309 of the Restatement, and considering the factors listed in section 6 of the Restatement, the Court concludes that it is appropriate to apply the law of Delaware to the issue of the existence and extent of MSHOW's corporate fiduciaries' duties to creditors. Because *Gheewalla* clearly holds that there is no direct duty owed by directors to creditors under Delaware law, and because the Trustee's remaining claims in this proceeding are not derivative claims, the Court concludes that the directors and officers of MSHOW did not breach any fiduciary duty to creditors. Therefore, the Trustee's claims against GD & C for aiding and abetting or conspiring in such a breach must fail.

### Limited Scope of Director and Officer Duties to Creditors of an Insolvent Corporation Under Colorado Law

█ On the evidence before it, this Court has concluded that a Colorado court, following the internal affairs doctrine, would apply Delaware law on the scope of the duty of MSHOW's directors and officers to creditors of MSHOW. The ultimate result would be no different if the Court applied Colorado law. Unlike Delaware law, under Colorado law, at least prior to the 2006 amendments to the Colorado Business Corporate Act,[8] when a corporation became insolvent a duty arose in its directors and officers to its creditors. *Alexander v. Anstine*, 152 P.3d 497, 502 (Colo.2007). However, in *Alexander* the Colorado Supreme Court makes clear this duty is "limited" in scope and "does not encompass the full set of fiduciary duties owed by directors and officers to shareholders of a solvent corporation." *Id.* This duty only requires officers and directors of an insolvent corporation to avoid favoring their own interests at the expense of creditors. They may not prefer themselves by taking corporate property, in repayment of debt or otherwise, to the prejudice of, or such that they defeat the claims of, general creditors. Colorado cases that have found a breach of this limited duty owed creditors by directors and officers of an insolvent corporation have typically involved

---

**8.** Colorado Revised Statutes § 7–108–401(5) (2006) states that directors and officers of corporations owe no fiduciary duties to its creditors.

insiders paying themselves instead of other creditors at a time when a corporation has ceased to do business.[9] That simply is not what MSHOW's officers and directors did in connection with the March 2001 bridge loans. There is no question but that Blue Chip's prior unsecured contingent claim was refinanced and secured as part of the March 2001 bridge loans to MSHOW-loans that provided more than $3.6 million of new cash to desperately cash-strapped MSHOW. Securing Blue Chip's $1,575 million contingent claim, Leach's agreement to subordinate his December 2000 and February 2001 senior secured positions, and Blue Chip's agreement to subordinate its February 2001 senior secured position all were parts of a larger effort to facilitate the bridge loans.

Each of these steps was taken to put each of the bridge lenders on equal footing in the effort to rescue MSHOW. These steps were incidental to the larger effort to keep MSHOW alive as a valuable going concern while seeking an acquisition partner or other recapitalization. The terms of the bridge loans were approved by MSHOW's board and under the circumstances were fair to MSHOW.

■ Approval and consummation of the bridge loans by MSHOW's officers and directors were not a breach of fiduciary duty to MSHOW, its creditors or anyone else. Notwithstanding the collateralization of Blue Chip's partially unsecured prior position, which may or may not foreseeably have improved that position vis-a-vis other unsecured creditors,[10] the directors'

---

**9.** *See, e.g., Crowley v. Green,* 148 Colo. 142, 365 P.2d 230 (Colo.1961)(director took corporate machinery for use in another business at a time when the corporation was defunct and not operating); *Nix v. Miller,* 26 Colo. 203, 57 P. 1084 (Colo.1899)(directors diverted corporate assets to the payment of personal debts, causing the corporation to become insolvent and the corporation ceased doing business); *John Boyle and Co. v. Colorado Patio and Awning Co., Inc.,* 654 P.2d 335 (Colo.App. 1982)(all of corporate assets transferred to president, corporation ceased doing business); *Rosebud Corp. v. Boggio,* 39 Colo.App. 84, 561 P.2d 367 (Colo.App.1977)(all corporate property sold with proceeds of sale paid directly to president); *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 778 F.Supp. 1116 (D.Colo.1991)(immediately prior to corporation ceasing operations, director distributed corporate funds to herself). Other fact situations in which Colorado courts have found a breach of this duty have involved purchase of corporate property at a foreclosure sale for less than fair value, *see, e.g. Fishel v. Goddard,* 30 Colo. 147, 69 P. 607 (Colo.1902) and *Collie v. Becknell,* 762 P.2d 727(Colo.App.1988); and direct transfers of corporate property or funds to a director as part of a "fraudulent scheme," *see New Crawford Valley, Ltd. v. Benedict,* 877 P.2d 1363 (Colo.App.1993).

**10.** The principal thrust of the Trustee's damage claims is that GD & C assisted MSHOW's officers and directors in making a $1.575 million voidable transfer to Blue Chip, an insider, and then concealing this "preference" from parties in interest and the Court when MSHOW filed bankruptcy. The Trustee's evidence of the elements of a preferential transfer under section 547(b) of the Bankruptcy Code is not compelling. The Trustee offered no evidence of value of any particular property of MSHOW at the time of the transfer in question as required by 11 U.S.C. §§ 547(b)(3) and 101(32)(A). The Trustee has not proved insolvency for section 547 purposes. Because MSHOW's bankruptcy was filed more than ninety days after the transfer in question, the Trustee enjoys no presumption of insolvency. 11 U.S.C. § 547(f).

While Blue Chip was closely related to MSHOW as a shareholder and lender, the evidence before the Court does not support a finding that Blue Chip was an "insider" for purposes of 11 U.S.C. §§ 547(b)(4)(B) and 101(31)(B). With respect to MSHOW, Blue Chip was not a director, officer, person in control, partnership in which MSHOW was a partner, general partner of MSHOW, affiliate, or insider of an affiliate. The Tenth Circuit Court of Appeals has expressly held that, where the transferee of a purported preferential transfer is an entity that has a designated representative on the board of a corporate-

decision to approve the bridge loans, when made, was not a decision to improve an insider's position at the expense of general creditors at a time when MSHOW was at least "equity" insolvent. It was, instead, an attempt to rescue or resuscitate MSHOW for the benefit of all corporate stakeholders, including general creditors. To view, in isolation, the aspect of this multifaceted transaction that "preferred" a related company over general unsecured creditors and to determine that this constituted a breach of fiduciary duty of officers and directors to creditors would depart from economic reality. The transaction, viewed in context, was an effort by insiders, putting at risk an additional $3,637,740 (in Blue Chip's case an additional $873,870) to rescue an enterprise that was on the brink of ruin, where creditors and investors alike were faced with the prospect of recovering nothing.[11] The actions of MSHOW's officers and directors in approving the March 2001 bridge loans was not the sort of overreaching by insiders to defeat general creditors' claims that constitutes a breach of the limited fiduciary duty under Colorado law of directors and officers to creditors of an insolvent corporation, identified by the Colorado Supreme Court in the *Alexander v. Anstine* case. Without a breach of such a fiduciary duty, the trustee's claims of conspiracy or aiding and abetting must fail, even if Colorado corporate law, as it existed prior to the 2006 amendments to the Colorado corporate statute, governs this case.

### Other Defenses

GD & C contends that it could not, in any event, be held liable as aider and abettor or conspirator in MSHOW's officers' and directors' conduct under Colorado law, for lack of knowing participation with, substantial assistance in, or agreement to any wrong doing.[12] Having determined that the evidence in this record fails to prove a breach of fiduciary duty by officers and directors of MSHOW, the Court need not address these arguments.

### Conclusion

Upon the foregoing findings of fact and conclusions of law, the Trustee's third and fourth claims against GD & C for aiding and abetting and conspiring in breaches of fiduciary duty by MSHOW's officers and directors must fail. Accordingly, it is

---

debtor-transferor, that relationship alone, where, as here, there is no evidence of misconduct by the designated board member, does not establish the transferee as an insider for purposes of section 547(b). *In re U.S. Medical, Inc.*, 531 F.3d 1272 (10th Cir.2008).

**11.** Colorado's fraudulent transfer statute expressly insulates a corporate insider from any liability for such a transfer, "[i]f made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor." C.R.S. § 38–8–109(6)(c). The official comments to this section of the Uniform Fraudulent Transfers Act state that this defense "reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort to save the debtor

from a forced liquidation in bankruptcy or otherwise." Given that the Colorado legislature has chosen to express its policy judgment in favor of good faith efforts at corporate rehabilitation in the fraudulent transfer statute, it would be somewhat incongruous to conclude that an identical transfer would breach a corporate insider's common-law fiduciary duties to the corporation's creditors.

**12.** GD & C also maintains that under Colorado law it is, in effect, immune from liability for aiding and abetting or conspiring with a client. As did the Colorado Supreme Court in the *Anstine* case, this Court, too, will leave this issue "for another day," noting only that GD & C is somewhat unclear as to just which client it would embrace in asserting this defense—MSHOW? Leach? MSHOW's other officers and directors?

ORDERED that Jeffrey L. Hill, Trustee, shall take nothing on his third and fourth claims against Gibson Dunn & Crutcher LLP in this adversary proceeding;

FURTHER ORDERED that each party shall bear its own costs in this adversary proceeding; and

FURTHER ORDERED that judgment shall enter forthwith in accordance herewith.